**LOWER SALFORD TOWNSHIP AUTHORITY, Petitioner**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 12, 2013.
Decided March 28, 2013.
Publication Ordered June 6, 2013.

---

Steven A. Hann, Lansdale, for petitioner.

William H. Gelles, III, Assistant Counsel, Norristown, for respondent.

BEFORE: BROBSON, Judge, and McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge BROBSON.

Petitioner Lower Salford Township Authority (Authority) petitions for review of an order of the Pennsylvania Environmental Hearing Board (Board). The Board, following remand by this Court,[1] denied the Authority's application for an award of attorneys' fees. In doing so, the Board concluded that the Authority failed to prove an element necessary for such an award—that conduct of Respondent Department of Environmental Protection (DEP) was a "significant factor"[2] in the decision of the Environmental Protection Agency (EPA) to withdraw established "TMDLs" (total maximum daily load) for Skippack Creek.[3]

---

**1.** *Upper Gwynedd Towamencin Municipal Auth. v. Dep't of Envtl. Prot.*, 9 A.3d 255 (Pa.Cmwlth.2010).

**2.** *Upper Gwynedd*, 9 A.3d at 268.

**3.** As we explained in our earlier decision, Section 303(d) of the federal Clean Water Act (Act), 33 U.S.C. § 1313(d),

vests with each state numerous responsibilities, including the establishment of water quality standards for bodies of water within

the boundaries of the state. The Act requires states first to evaluate the use of a body of water. Based upon the particular use of a body of water, such as recreation or consumption, the state must then determine the water quality standards the body of water must meet in order to serve the designated use. Part of the evaluation of these standards involves determining the maximum amount of various pollutants the body of water may contain before its designated use is impaired. The amount of per-

## Background

In *Upper Gwynedd,* our earlier opinion in this matter, the Authority sought attorneys' fees after the Authority and DEP entered into a stipulation of settlement of the parties' dispute concerning the TMDLs. The settlement arose after EPA withdrew the TMDLs and the Authority agreed to withdraw its suit against DEP, which was pending before the Board. The Board denied the Authority's application, and the Authority appealed that decision. This Court concluded that the Board did not err in electing to apply the so-called "catalyst approach" to the Authority's application for attorneys' fees and costs associated with the lawsuit that it brought against DEP. We agreed with the Board's description of the catalyst approach as requiring an applicant for attorneys' fees to demonstrate: (1) that the opposing party provided some of the benefits that the fee-requesting party sought in the underlying suit; (2) that the suit stated a genuine claim; and (3) that the suit was a substantial or significant reason why the opposing party, voluntarily or otherwise, provided the benefit or partial benefit that the fee-requesting party sought in the underlying suit. *Upper Gwynedd,* 9 A.3d at 264–65. We concluded, however, that the Board applied the catalyst approach too narrowly. The Board determined that the Authority failed to demonstrate all of the required elements based upon the fact that EPA, not DEP, withdrew the TMDLs. We concluded that the possibility remained that, even though EPA took the formal action of withdrawing the TMDLs, DEP may have participated in EPA's decision-making to such a significant level that the Authority could meet its burden under the catalyst approach. We explained:

> [W]e do not believe that we are constrained to preclude plaintiffs ( [Lower Salford] ) from seeking fee awards from a defendant (DEP) that may have played a role in the decision-making process by a non-party (EPA), which ultimately provides relief that the plaintiff had sought from the defendant. We believe the catalyst rule can be applied in certain circumstances where a plaintiff obtains some of the relief it sought from a lawsuit from a non-party *as a result of some action or change of conduct* by the party against which the plaintiff brought the lawsuit.

*Upper Gwynedd,* 9 A.3d at 267 (emphasis in original).

As we sought to emphasize, the record gave every appearance that EPA played the primary role in the withdrawal of the TMDLs:

> [I]f DEP has no legal authority to effectuate or direct EPA to approve or withdraw TMDLs, then there appears to be no change in conduct on the part of DEP that would have resulted in [Lower Salford] obtaining any or some of the relief it sought in its action against DEP.... [O]n remand, [the Board] will have to grapple with the question of whether DEP's involvement in EPA's decision-making process was sufficient to justify an award of attorneys' fees in this case.
>
> ...
>
> Because the *possibility* exists that DEP's conduct *may* have played a significant role in EPA's withdrawal decision, [the Board] must reconsider [the Authority]'s fee application to determine what, if any, role DEP's conduct played in the decision. If [the Board] determines that some conduct on the part of

*Upper Gwynedd,* 9 A.3d at 257–58.

mitted effluents is referred to as "total maximum daily load" or TMDLs.

DEP was a significant factor in EPA's withdrawal decision, [the Board] could conclude that [the Authority] is entitled to an award of fees.

*Upper Gwynedd,* 9 A.3d at 267–68 (emphasis in original).

On remand, the Authority presented the testimony of Thomas Henry. Mr. Henry, a retired TMDL manager from EPA's Region III office, drafted EPA's Decision Rationale, which formally withdrew the TMDLs. The Authority also offered EPA's Decision Rationale into the record on remand.

As to the testimony of Mr. Henry, the Board concluded that his testimony was not helpful in any significant manner, because he could not speak on behalf of EPA and his recollection of the matter was incomplete. The Board pointed to parts of Mr. Henry's testimony in which he stated that he could not recall any discussions with DEP before EPA issued the Decision Rationale. The Board also considered Mr. Henry's testimony regarding a meeting at State College regarding TMDLs. The Authority argued that during the meeting, which was attended by DEP personnel, Dr. Hunter Carrick, who worked for DEP in developing the TMDLs, expressly noted flaws in his methodology. Mr. Henry, however, could not recall whether DEP took a position regarding the TMDLs at that meeting. For those reasons, the Board concluded that Mr. Henry's testimony was insufficient to support a finding that DEP played a significant role in EPA's decision-making process.

The Board also rejected the other arguments advanced by the Authority. First, DEP rejected the Authority's argument concerning DEP's act of forwarding to EPA reports that the Authority's experts prepared for purposes of challenging the TMDLs in its lawsuit against DEP. The reports provided early information suggesting problems with Dr. Carrick's methodology. The Board concluded that, even if DEP did forward the reports to EPA, and the reports, in turn, played a part in the decision-making process, DEP's act of forwarding the reports was insufficient to support a finding that DEP's actions were a significant factor in EPA's decision-making. Rather, the Board reasoned that the Decision Rationale reflected identification of errors in methodology from sources in addition to the Authority's expert reports and that DEP's act of turning over the reports to EPA was simply not enough to constitute a significant factor in the decision-making process. The Board also rejected the Authority's claim that, because DEP played a significant role in the development of the TMDLs, it necessarily must have played a significant role in the withdrawal. Finally, the Board rejected the Authority's argument that Dr. Carrick essentially acted as DEP's agent throughout the withdrawal process and, therefore, that his admission that his methodology was faulty was a significant factor that is also attributable to DEP. In summary, the Board opined that "[t]he Authority has not been able to point to *any* conduct on the part of [DEP] of any real consequence in connection with the withdrawal." (Board Opinion at 8 (emphasis in original).)

On appeal to this Court, the Authority raises the following issues: (1) whether the Board applied the catalyst approach too narrowly; (2) whether the Board reached a conclusion that is contrary to the Clean Water Act;[4] and (3) whether the Board's decision is not supported by substantial evidence of record.[5]

---

**4.** 33 U.S.C. §§ 1251–1387.

**5.** The Authority also contends that the Board abused its discretion in granting DEP's mo-

■ At the outset, it is important to reflect upon our standard of review of a decision of the Board, which in a case involving an application for attorneys' fees is limited to considering whether the Board abused its discretion. *Upper Gwynedd*, 9 A.3d at 263 n. 10 (Pa.Cmwlth. 2010); *Solebury Twp. v. Dep't of Envtl. Prot.*, 593 Pa. 146, 158, 928 A.2d 990, 997 (2007). As indicated by *Upper Gwynedd*, we must also consider whether substantial evidence supports factual findings pertinent to the legal question of whether DEP's conduct was a significant factor in EPA's withdrawal of the TMDLs. If the Board's findings are supported by substantial evidence, and those findings, in turn, support the Board's conclusion that DEP's conduct was not a significant factor, we must affirm the Board's decision.

■ The Authority first argues that the Board applied the catalyst approach in an overly restrictive manner. As we stated at the outset, we concluded in our previous decision that the Board applied the catalyst approach too restrictively, and that, in order to apply the analysis appropriately in this case, the Board was required to determine whether DEP's conduct was a significant factor in EPA's withdrawal decision. As indicated above, the Board's factual findings, which are subsumed within the text of its opinion, indicate that DEP played no part in EPA's decision-making process. The Board reviewed the record and determined that DEP did not seek to persuade EPA to withdraw the TMDLs and, at most, forwarded the Authority's expert reports to EPA. The Board reviewed the record and found no indication that DEP asked EPA to withdraw the TMDLs, participated in meetings or conferences regarding the withdrawal, or sent EPA memos or documents recommending or arguing in favor of withdrawing the TMDLs. Based upon the evidence of record, we conclude that the Board had substantial evidence to support its key factual findings that DEP "had very little involvement" in the withdrawal decision (Board Opinion at 2) and that DEP was "little more than an interested, but largely unengaged, bystander." (Board Opinion at 4.) The Board found that the only evidence connecting DEP to the EPA Decision Rationale was DEP's act of forwarding the Authority's expert reports to EPA. The Board rejected the notion that the expert reports were the sole basis for the withdrawal decision and held that DEP's act of forwarding the reports was not enough to demonstrate that DEP's conduct was a significant factor in the decision.

The Authority continues to argue, however, that Dr. Carrick's change in conduct regarding his methodology set in motion a chain of events that lead to the withdrawal and that this chain of events is sufficient to demonstrate DEP's involvement in EPA's withdrawal decision. We disagree. The Board as fact finder determined based upon substantial evidence that DEP played no role in the decision-making process after it forwarded the Authority's expert reports to EPA. The record supports

tion to quash subpoenas that the Authority directed to Dr. Carrick, whose testimony the Authority claims would have provided evidence relevant to the question of DEP's conduct relative to EPA's withdrawal decision. DEP asserts that the Authority failed to preserve this issue because it did not raise the issue in its post-hearing brief. We agree that the issue is waived. 25 Pa.Code § 1021.131 (Code); *Sunoco, Inc. (R & M) v. Dep't of Envtl. Prot.*, 865 A.2d 960, 974 (Pa.Cmwlth. 2005). The Authority relies upon the use of the allegedly "permissive" word "may" in the Code regulation, but, in accordance with the clear language requiring a party to present legal argument, and the admitted failure to include such argument in the post-hearing brief, no basis exists upon which to conclude that the Board abused its discretion.

this characterization of DEP's part in the withdrawal, and we agree with the Board's decision that such conduct is insufficient to support a legal conclusion that DEP provided some of the benefit the Authority sought in its underlying lawsuit against DEP. Thus, we conclude that the Board did not err in its application of the catalyst approach, or, by consequently concluding that the Authority failed to carry its burden under the catalyst approach.

■ The Authority next argues that the Board's decision is contrary to the Clean Water Act and, therefore, is erroneous. The thrust of this argument is that the Clean Water Act vests states with the power to *propose* TMDLs and that EPA is empowered to *enact* TMDLs only when a state fails to propose acceptable TMDLs to EPA. The Authority argues that the Clean Water Act does not provide EPA with the power to adopt TMDLs in a situation such as this, where a state makes an initial proposal for TMDL standards. Thus, the Authority argues that EPA cannot be responsible for the withdrawal of TMDLs, especially in light of the lack of any language in the Clean Water Act regarding the withdrawal of TMDLs.

In response, DEP argues that this issue has already been decided and constitutes the law of the case.[6] We agree. In *Upper Gwynedd,* we wrote:

> Although the Act places primary responsibility on a state to establish TMDLs,

the Consent Decree and the [Memorandum of Understanding] also provided EPA with the power to establish the TMDLs, which from the record appears to be exactly what happened here.

Even more significant is the fact that the Act itself places with EPA the ultimate power to *approve* TMDLs. This ultimate authority of EPA raises the question of whether, even if DEP had established the TMDLs, DEP could take any action to withdraw the TMDLs once EPA approved them. Consequently, if DEP has no legal authority to effectuate or direct EPA to approve or withdraw TMDLs, then there appears to be no change in conduct on the part of DEP that would have resulted in [the Authority] obtaining any or some of the relief it sought in its action against DEP.

*Id.* at 267–8. Thus, this Court has already addressed and rejected this question of whether EPA's withdrawal of the TMDLs it approved could nevertheless be attributed to DEP as a matter of law, based upon, among other factors, EPA's duties under the federal consent decree, which had continuing vitality throughout the process of TMDL adoption;[7] otherwise, we would not have framed the ultimate issue on remand so narrowly. Accordingly, we will not address this issue again.

The Authority's final argument is that the Board's decision is inconsistent with

6. *See Commonwealth v. Fletcher,* 604 Pa. 493, 521 n. 20, 986 A.2d 759, 776 n. 20 (2009) (providing that "[t]he 'law of the case' doctrine[ ] refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter").

7. As we recognized in *Upper Gwynedd,* the consent decree and memorandum of understanding arising in federal litigation provided in pertinent part that "DEP will share any

existing and readily available water quality related data with EPA to assist EPA in establishing TMDLs." *Upper Gwynedd,* 9 A.3d at 259. As we acknowledged in *Upper Gwynedd,* while the federal litigation also recognized the significant role DEP was to play in the setting (or attribution) of proposed TMDLs, EPA was a key player, factually and legally, with regard to the setting of TMDLs and, by virtue of the same legal authority, played a greater role in electing to withdraw the TMDLs, both factually and legally.

the record. The Authority criticizes the Board, arguing that the Board never considered whether its lawsuit against DEP triggered EPA's withdrawal decision. Our remand directive, however, makes clear that the question of whether the lawsuit triggered EPA's action was not the focus of the query, considering the fact that EPA, rather than DEP, withdrew the TMDLs. In accordance with our direction to the Board in *Upper Gwynedd*, the Board considered whether DEP's conduct, through involvement with EPA's process of withdrawing the TMDLs, was a significant factor. Nevertheless, the Authority argues that the Board ignored the sworn declaration that Mr. Henry provided in a federal proceeding connected to a motion that EPA filed with a federal court to modify a consent decree. In his sworn declaration, Mr. Henry stated:

> In July 2006, after the Skippack Creek TMDL had been established, Dodds et al., published an erratum that corrected the original 2002 equation.... EPA was not aware of this erratum until December 2006, when expert reports submitted to the [Board] (as part of [the Authority's] appeal of the Skippack Creek TMDL), were shared with EPA by [DEP]. These expert reports raised additional questions concerning the general approach EPA used in establishing the nutrient end-points for the Skippack Creek TMDL, including questions related to the quantity of data collected, the significance of nonpoint source contributions, the significance of algal species, and whether end-points in the TMDL were sufficient to control algal growth.

(Reproduced Record (R.R.) at 1973–74.)

The Authority, however, does not mention other aspects of Mr. Henry's statement, such as paragraph 23, which provides that "[a]fter discussions with Dr. Carrick and the review of the comments and expert reports *received on other*

*TMDLs,* EPA evaluated its approach to TMDL development for Indian Creek, Chester Creek, Paxton Creek, Sawmill Creek, and Southampton Creek." (R.R. at 1975 (emphasis added).)

Based upon Mr. Henry's entire declaration, we cannot agree with the significance the Authority places upon the isolated reference in Mr. Henry's declaration to the Skippack Creek TMDLs and the Authority's expert reports. Rather, as indicated in the above-quoted paragraph 23, EPA regarded not only its role as primary in the establishment of the TMDLs, but also in the withdrawal of the TMDLs. Moreover, EPA apparently referred to other expert reports in reaching its ultimate withdrawal decision. Other than mentioning Dr. Carrick's involvement in the development of the TMDLs and Dr. Carrick's ultimate acknowledgment that his methodology was flawed, the declaration supports DEP's position.

Most importantly, we reiterate the notion that the Board is the ultimate fact finder and is the body to determine the weight to be accorded evidence in a record. *Birdsboro v. Dep't Envtl. Prot.,* 795 A.2d 444, 447–48 (Pa.Cmwlth.2002). The Board rendered factual findings supported by substantial evidence, and it reasoned that the evidence did not support a conclusion that DEP's conduct was a significant factor in EPA's decision to withdraw the TMDLs.

Accordingly, we affirm the Board's order denying the Authority's application for an award of attorneys' fees and costs.

### ORDER

AND NOW, this 28th day of March, 2013, the order of the Pennsylvania Environmental Hearing Board is AFFIRMED.