# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sierra Club,                                      :
                        Petitioner      :
                               :
        v.                              :      No. 563 C.D. 2018
                               :      Argued:  February 12, 2019
Department of Environmental            :
Protection,                                      :
                  Respondent      :


BEFORE:  HONORABLE MARY HANNAH LEAVITT, President Judge
               HONORABLE ROBERT SIMPSON, Judge
               HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE ELLEN CEISLER, Judge


**OPINION BY JUDGE BROBSON**       **FILED:  June 11, 2019**


In this appeal from a decision by the Pennsylvania Environmental Hearing Board (EHB), Petitioner the Sierra Club contends that the EHB erred when it denied the Sierra Club's Application for Fees and Costs (Fee Application) from the Pennsylvania Department of Environmental Protection (Department) under Section 307(b) of The Clean Streams Law.[1]  Generally, the Sierra Club complains that the EHB took a far too narrow approach at applying precedent from the Pennsylvania Supreme Court and this Court analyzing and applying the fee/cost shifting provision of The Clean Streams Law.  For the reasons set forth below, we

---

[1] Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S.§ 691.307(b).

reject the Sierra Club's arguments and affirm the EHB's exercise of discretion in this matter.

According to the uncontested findings of the EHB, Lackawanna Energy Center, LLC (LEC) set out to construct a natural gas-fired power plant in the Borough of Jessup, Lackawanna County. As part of that process, LEC applied to the Department for permits relating to industrial wastewater discharge associated with the planned power plant.

The Department issued LEC a National Pollutant Discharge Elimination System (NPDES) permit on March 2, 2016, authorizing LEC to discharge not more than 290,000 gallons per day (gpd) of industrial waste from the proposed plant into Grassy Island Creek. The Department classifies Grassy Island Creek for purposes of aquatic life use as Cold Water Fishes (CWF) and Migratory Fishes (MF). The approved point of discharge was 1.1 miles upstream from the confluence of Grassy Island Creek and the Lackawanna River, which is also classified as CWF and MF. At the point of confluence with Grassy Island Creek the Lackawanna River also enjoys the High Quality (HQ) water quality designation. HQ waters are "[s]urface waters having quality which exceeds levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water." 25 Pa. Code §§ 93.1 (definitions), 93.4b(a).[2]

On March 6, 2016, and after receiving the NPDES permit, LEC applied to the Department for a water quality management (WQM) permit. The WQM permit works in tandem with the NPDES permit, as it represents to the Department how the applicant proposes to construct its treatment facility, pursuant to Department

---

[2] HQ waters and Exceptional Value (EV) waters of the Commonwealth are afforded special protection under the state's environmental laws. Of the two, EV waters are afforded greater protection. *See* 25 Pa. Code §§ 93.4a(c), (d).

standards, to ensure compliance with the effluent limits set in the NPDES permit. The Department issued a WQM permit to LEC on May 24, 2016.

The Sierra Club lodged separate appeals with the EHB, challenging first the issuance of the NPDES permit and then the issuance of the WQM permit. The EHB consolidated the appeals at the request of the parties on September 1, 2016. The gist of the Sierra Club's challenges to both permits was that the Department failed to require LEC, as part of the permitting process, to "evaluate nondischarge alternatives to the proposed discharge and use an alternative that is environmentally sound and cost[ ]effective when compared with the cost of the proposed discharge." *Id.* § 93.4c(b)(1)(i)(A). Assuming LEC demonstrated the absence of environmentally sound and cost-effective nondischarge alternatives, the Sierra Club maintained that the Department failed to require LEC, as part of the permitting process, to "demonstrate that the discharge will maintain and protect the existing quality of receiving surface waters." *Id.* § 93.4c(b)(1)(i)(B).

It is undisputed that the Department requested LEC to conduct an antidegradation analysis as part of the permitting process. The Sierra Club, however, challenged not the absence of an analysis, but the adequacy/sufficiency of the analysis that LEC submitted to the Department in support of its permit applications. As for the Department, the Sierra Club maintained that the Department failed to apply to its review of LEC's submissions the level of rigor required under the law. Because of these failures, the Sierra Club maintained that issuance of the permits violated The Clean Streams Law[3] and Article I, Section 27 of the Pennsylvania Constitution, known as the Environmental Rights Amendment.

---

[3] Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1-.1001.

In April 2017, while the Sierra Club's consolidated appeals were pending before the EHB, LEC sought to amend its NPDES permit to eliminate the discharge of industrial wastewater from the planned power plant into Grassy Island Creek. (Reproduced Record (R.R.) 799a-801a.) According to the application to amend, LEC decided to employ alternative technology at the plant, thereby reducing the amount of industrial wastewater generated to a level that could be transported from the facility by truck for offsite treatment. LEC asked that its NPDES permit be amended to eliminate industrial wastewater discharge, leaving only the permitted discharge of industrial stormwater, which the Sierra Club did not challenge. The Department approved the amendment on April 17, 2017. With that approval, and because LEC no longer planned to treat onsite industrial wastewater for discharge into Grassy Island Creek, on April 25, 2017, LEC requested that the Department terminate the WQM permit. By letter dated April 27, 2017, the Department informed LEC that the termination would become effective within 30 days of the date of the letter.

In light of the NPDES permit modification and the WQM permit termination, the Sierra Club, LEC, and the Department jointly petitioned the EHB on June 15, 2017, to issue a final order dismissing the Sierra Club's consolidated appeals as moot and requesting that the EHB retain jurisdiction only for purposes of entertaining a timely application for costs and fees by the Sierra Club. On June 16, 2017, the EHB granted the petition, dismissed the consolidated appeals as moot, and gave the Sierra Club until July 17, 2017, to file its application for costs and fees.

In its Fee Application, the Sierra Club maintained that it was entitled to fees and costs under Section 307(b) of The Clean Streams Law, which provides, in

4

relevant part: "The [EHB], upon the request of any party, may in its discretion order the payment of costs and attorney's fees it determines to have been reasonably incurred by such party in proceedings pursuant to this act." Both LEC and the Department opposed the Fee Application, even though the Sierra Club only sought an award against the Department. The EHB conducted an evidentiary hearing on the Fee Application on November 15, 2017, where all of the parties had the opportunity to submit evidence in support of and in opposition to the Fee Application. The EHB also accepted post-hearing briefs from the parties.

In an Opinion and Order issued March 28, 2018 (EHB Opinion), the EHB denied the Fee Application.[4] In so doing, the EHB first set forth its three-prong analysis in deciding fee/cost applications under Section 307(b) of The Clean Streams Law. First, the EHB asks whether the applicant incurred the fees/costs in a proceeding pursuant to The Clean Streams Law. If so, the EHB next determines whether the applicant satisfies "threshold criteria" for the award. If both the first and second prong are satisfied, the EHB proceeds to determine the appropriate amount of the award. (EHB Opinion at 5.)

Bypassing the first prong of its analysis, the EHB noted that the "threshold criteria" for the award under the second prong will vary, depending on whether the applicant obtained a final ruling from the EHB on the merits. Because the Sierra Club did not secure a final ruling on the merits of its appeals, the EHB applied the catalyst test. Under the catalyst test, the applicant must demonstrate the following to be considered eligible for an award under Section 307(b) of The Clean Streams Law:

> (1) that the opposing party provided some of the benefits
> that the fee-requesting party sought in the underlying suit,

---

[4] Chief Judge and Chairman Thomas W. Renwand issued a separate dissenting opinion.

(2) that the suit stated a genuine claim, and (3) that the suit was a substantial or significant reason why the opposing party, voluntarily or otherwise, provided the benefit or partial benefit that the fee-requesting party sought in the underlying suit.

*Lower Salford Twp. Auth. v. Dep't of Envtl. Prot.*, 67 A.3d 50, 52 (Pa. Cmwlth. 2013); *see Upper Gwynedd Towamencin Mun. Auth. v. Dep't of Envtl. Prot.*, 9 A.3d 255, 265 (Pa. Cmwlth. 2010), *appeal denied*, 23 A.3d 1058 (Pa. 2011).

Assessing whether the Sierra Club satisfied the catalyst test, the EHB focused on the third proof element and concluded that the Sierra Club failed to establish that its consolidated appeals were a substantial or significant cause of LEC's decision to eliminate from its planned facility any discharge of industrial wastewater into Grassy Island Creek. The EHB reasoned:

> In essence, Sierra Club's argument is that, because it filed an appeal and because LEC later made changes to its facility that eliminated the discharge Sierra Club challenged, the appeal must have been a cause, if not the only cause, of LEC's decision. Sierra Club has not provided any evidence other than the relative timing of the events to show that LEC made changes to its facility *as a result of* Sierra Club's appeal, either in whole or in part.
>
> Although the relative timing of events can support a finding of causation, it is rarely enough by itself. A well[-]executed rain dance is unlikely to be the cause of subsequent rainfall. In the absence of any other reasonable explanation, a showing of temporal alignment might have been entitled to more weight, but here, in contrast to Sierra Club's limited showing, LEC presented the uncontradicted testimony of Daniel Ewan, Vice President of Thermal Development at Invenergy LLC, a company of which LEC is an affiliate. Mr. Ewan led the team of engineers and developers responsible for the development of the LEC facility in Jessup, and he reviewed and approved the NPDES and WQM permit applications. Mr. Ewan credibly testified that the reason that LEC redesigned its facility to eliminate the discharge was for

6

purely economic and business reasons, and it was not prompted by Sierra Club's appeals.

He testified that LEC's team of consultants were [sic] engaged in a continual process of trying to reduce the amount of wastewater generated from the facility. Early on in that process, LEC had changed the design of its facility from being water-cooled to air-cooled, which reduced the volume of wastewater from more than a million gallons per day [(gpd)] to 290,000 gpd. That volume of wastewater was still too much to be trucked off site or conveyed to a sewer system. Once in possession of the preliminary effluent limitations in the draft NPDES permit, LEC could perform a detailed engineering analysis and determine what equipment was needed to meet the limits. Mr. Ewan testified that, when the final effluent limitations were issued, they were more stringent than LEC anticipated and more equipment needed to be added at a significantly higher cost in order to meet the final limits. Therefore, LEC asked its engineers to look for ways to bring down the cost of the operation by reevaluating processes, looking at new technology, and assessing ways to handle the wastewater differently. LEC identified additional opportunities for wastewater reduction that made other disposal options, such as trucking and using an existing sewer system, more economically and technically feasible.

We have no reason to doubt Mr. Ewan's testimony that LEC was engaged in an ongoing process to try to bring down its costs, and that it was this ongoing process that led to the elimination of the discharge to Grassy Island Creek. He said that capital costs were evaluated throughout the permit application process, including costs associated with wastewater. The reduction in wastewater that LEC was ultimately able to achieve will save approximately $3 million in capital costs.

. . . .

. . . Ultimately, in the face of credible testimony to the contrary, Sierra Club never shows that LEC was motivated in any part by Sierra Club's appeal, or the objections pursued by Sierra Club over the course of the

7

litigation, to make the design changes that eliminated the
need for a discharge.

(EHB Opinion at 6-9 (emphasis in original) (record references omitted).)
Concluding that the Sierra Club did not meet its burden of proof under the third
element of the catalyst test, the EHB denied the Fee Application without any
additional analysis.

The Sierra Club filed a timely petition for review, challenging the
EHB's denial of its Fee Application. In its brief, the Sierra Club identifies four
separate questions involved in this appeal. The first asks whether the EHB
committed an error of law or abused its discretion in taking an "overly restrictive"
approach to applying the catalyst test. The second asks whether the EHB committed
an error of law or abused its discretion in concluding that the Sierra Club failed to
meet its burden of proof with respect to the third element of the catalyst test. Similar
to the second question, the third question asks whether the EHB's factual finding(s)
with respect to why LEC redesigned its facility to eliminate wastewater discharge
into Grassy Island Creek was against the weight of substantial evidence introduced
at the hearing on the Fee Application. Finally, but similar to the first question, the
fourth question asks whether the EHB erred as a matter of law or abused its
discretion by using an "overly strict application" of the catalyst test and the standards
set forth in *Kwalwasser v. Department of Environmental Resources*, 569 A.2d 422
(Pa. Cmwlth. 1990), where the EHB is entitled to broad discretion in ruling on fee
applications under Section 307(b) of The Clean Streams Law.

Notwithstanding the separate identification of these four questions
earlier in its brief, much of the Sierra Club's argument in its principal and reply
briefs focuses on the underlying merits of its appeals from the Department's
permitting decisions. Specifically, the Sierra Club argues strongly that the

8

Department erred in awarding the NPDES and WQM permits without requiring LEC to evaluate thoroughly nondischarge alternatives that would be more cost effective than the proposed discharge into Grassy Island Creek. Had the Department required LEC to engage in this analysis as part of the application process, the Sierra Club contends that LEC would have reached the same conclusions that it ultimately reached during the permit appeals—*i.e.*, that available nondischarge alternatives to the proposed discharge were achievable and cost effective for LEC.

We emphasize, however, that the EHB did not engage in a fulsome analysis of the merits of the Sierra Club's Fee Application. In particular, the EHB did not engage in any analysis of whether LEC's decision to seek modification of the terms of its NPDES permit and termination of its WQM permit and/or the Department's favorable action on those requests provided any of the benefits, or relief, that the Sierra Club sought to achieve through its appeals. Rather, the EHB denied the Fee Application on a single ground, that being that the Sierra Club failed to meet its burden of proof under the third element of the catalyst test. We will, therefore, confine our review to the issues and arguments of the Sierra Club in support of reversal addressed to that determination.

Our review of EHB determinations under Section 307(b) of The Clean Streams Law is limited to determining whether the EHB abused its discretion. *Solebury Twp. v. Dep't of Envtl. Prot.*, 928 A.2d 990, 997 n.8 (Pa. 2007) (*Solebury I*). In *Kwalwasser*, we noted that our disagreement with the EHB's reasoning or result is not sufficient ground to overturn the EHB's decision. We may not substitute our judgment for that of the EHB. *Kwalwasser*, 569 A.2d at 424. Rather, "[a]n abuse of discretion occurs if, in reaching a conclusion, the law is overridden or misapplied or the judgment exercised is manifestly unreasonable or is the result of

9

partiality, prejudice, bias, or ill will." *Luzerne Cty. Children & Youth Servs. v. Dep't of Human Servs.*, 203 A.3d 396, 398 (Pa. Cmwlth. 2019).

In light of the foregoing, we first consider the question of whether the EHB overrode or misapplied the law by employing what the Sierra Club considers to be an "overly restrictive" approach to Section 307(b) fee/cost applications. The Sierra Club does not take issue with the EHB's use of the catalyst test.[5] Rather, with respect to the third element of the test, which the EHB refers to in its decision as the "causation requirement," the Sierra Club is critical of the burden of proof that the EHB is placing on applicants to satisfy that proof element. Essentially, the Sierra Club contends that the EHB required the Sierra Club in this case to prove affirmatively that LEC's "true motive" in requesting the changes to its permits, which effectively afforded the Sierra Club the relief it sought in the consolidated appeals, was to avoid further litigation before the EHB by mooting the consolidated appeals. This, the Sierra Club argues, places an unfair, expensive, and onerous burden on applicants. The Sierra Club also contends that this approach is inconsistent with the EHB's decision in *Solebury Township v. Department of Environmental Protection*, 2008 EHB 658 (Dec. 1, 2008) (*Solebury II*).

In response, the Department contends that the Sierra Club's argument that the EHB was too rigid in its evaluation of the causation requirement actually seeks to diminish the value of that portion of the catalyst test. Instead, the Sierra Club essentially seeks to give primacy to the fact that it obtained the practical relief it sought in its consolidated appeals when LEC abandoned its plans to discharge wastewater in Grassy Island Creek, without the need for establishing a

---

[5] "The Sierra Club is not asking this Court to evaluate the sufficiency of the catalyst test." (Sierra Club Reply Br. at 3.)

10

cause-and-effect relationship between the consolidated appeals and LEC's decision. Responding to the Sierra Club's claim that the EHB's decision in this matter is at odds with its earlier decision in *Solebury II*, the Department notes that it was on remand from the Pennsylvania Supreme Court's decision in *Solebury I* that the EHB adopted the catalyst test as a more lenient approach to evaluating fee applications where there is no final decision on the merits before the EHB and thus no clear "prevailing party." The EHB applied the catalyst test in *Solebury II* on remand, including the causation requirement. It specifically looked to determine whether there was a causal relationship between the appeals before the EHB and the actions taken by the state agencies that ultimately mooted those appeals. Looking to the evidence, the EHB concluded that the causation requirement was satisfied in *Solebury II*. The fact that the EHB looked at the evidence in this case but reached a different conclusion does not, according to the Department, mean that its decision in this matter was inconsistent with *Solebury II*.

LEC, as Intervenor, generally supports the Department's position. LEC argues that the EHB did not abuse its discretion in denying the Fee Application. According to LEC, the EHB made factual findings based on substantial evidence and reached reasonable conclusions based on those findings. LEC further maintains that the EHB's approach to the Fee Application and its decision are consistent with *Solebury II* and this Court's precedent. While the EHB noted that timing can be a factor, it also appropriately concluded that it is not necessarily the sole or controlling factor. LEC argues that what the Sierra Club is seeking is a change in the law, one that would read the causation prong out of the catalyst test.

Under Section 307(b) of The Clean Streams Law, the EHB has broad discretion to award or deny attorneys' fees and costs in a particular proceeding.

11

*Solebury I*, 928 A.2d at 1003. This broad discretion includes the authority to adopt standards by which the EHB will evaluate applications for costs and fees. *Id.* at 1004. Such standards, however, must be consistent with "Pennsylvania's strong public policy to justly compensate parties [that] challenge agency actions by liberally interpreting fee-shifting provisions." *Id.* For this reason, in *Solebury I*, the Pennsylvania Supreme Court held that the EHB may not limit its award of fees and costs under Section 307(b) only to those parties that obtain a favorable ruling from the EHB on the merits. Rather, agreeing with this Court, the Pennsylvania Supreme Court held that the EHB should consider the practical relief that the applicant sought before the EHB in applying Section 307(b) of The Clean Streams Law to a situation where, as here, a matter before the EHB is dismissed as moot. *Id.* at 1004-05.

Following *Solebury I*, the EHB adopted the catalyst test, the third element (the causation requirement) of which is at issue in this matter. This element requires the applicant to prove, by a preponderance of the evidence, that the applicant's "lawsuit brought about a change in an opposing party's conduct." *Upper Gwynedd*, 9 A.3d at 266. If the salient purpose of the fee shifting provision in The Clean Streams Law is to compensate those that challenge governmental actions to advance public policy objectives, *Solebury I*, it is both reasonable and consonant with that purpose for the EHB to require a fee applicant to show that, notwithstanding the absence of a favorable ruling on the merits, its legal challenge caused, at least in part, the favorable outcome that the applicant sought. As the EHB observed in *Solebury II*, "[p]arties are not awarded fees for filing appeals. They are awarded fees for achieving results." *Solebury II*, 2008 EHB at 682.[6]

---

[6] EHB decisions are not binding on this Court. *Pa. Trout v. Dep't Envtl. Prot.*, 863 A.2d 93, 107 (Pa. Cmwlth. 2004). The EHB, too, is not bound by its precedent. "We are mindful,

12

Upon review of the EHB's decision in this matter, as well as the Pennsylvania Supreme Court's decision in *Solebury I*, we disagree with the Sierra Club's view that the EHB's application of the causation requirement in this particular case was outside the bounds of fairness or inconsistent with the public policies underlying the fee-shifting provision in Section 307(b) of The Clean Streams Law. Here, the EHB required the Sierra Club, as movant, to convince the EHB, by a preponderance of the evidence,[7] that the Sierra Club's challenge to the WQM and NPDES permits caused, in whole or in part, LEC to redesign its facility and eliminate wastewater discharge into Grassy Island Creek, which in turn caused the Department to grant the permit modification to the NPDES permit and to terminate the WQM permit. *See Solebury II*, 2008 EHB at 675-76 ("The important point is that the agency changed its conduct at least in part as a result of the appeal. The appeal caused the change, not necessarily the 'merits' of the appeal.").

We see nothing in the EHB's Opinion that required the Sierra Club to prove that LEC's "true motive" for redesigning its planned plant was to moot the Sierra Club's appeals of the Department's permitting decisions. The EHB only required LEC to prove that there was "more likely than not" a causal connection between the Sierra Club's appeals and LEC's redesign decision. Placing this burden on the party seeking the relief is consistent with the rules governing practice and

---

however, that while an administrative agency is not bound by its prior precedent, it must render consistent opinions and should either follow, distinguish or overrule its own precedent." *Id.* at 107 n.5.

[7] The "preponderance of the evidence" standard is the lowest evidentiary standard and tantamount to a "more likely than not" inquiry. *Carey v. Pa. Dep't of Corr.*, 61 A.3d 367, 374 (Pa. Cmwlth. 2013). In essence, whether the party with the burden of proof satisfies this standard turns on the fact finder's weighing of the evidence. *See Agostino v. Twp. of Collier*, 968 A.2d 258, 269 (Pa. Cmwlth.), *appeal denied*, 982 A.2d 66 (Pa. 2009).

13

procedure before the EHB and our precedent on fee/cost-shifting provisions. *See* 25 Pa. Code § 1021.122(a);[8] *Jones v. Muir*, 515 A.2d 855, 859 (Pa. 1986) ("The applicant for counsel fees has the burden of proving his/her entitlement thereto."); *Lower Salford*, 67 A.3d at 52 (placing burden on applicant).

We turn next to the Sierra Club's claim that the EHB erred in finding that the Sierra Club failed to meet its burden of proof and persuasion on the causation requirement or, alternatively stated, that there is no substantial record evidence to support the EHB's findings with respect to why LEC redesigned its facility to eliminate wastewater discharge into Grassy Island Creek. Upon our review of the EHB's decision and the evidentiary record, we conclude that substantial record evidence supports the EHB's factual findings with respect to the causation requirement.

Specifically, the EHB concluded that the Sierra Club's only evidence on the causation element was the relative timing of events—*i.e.*, that LEC redesigned its facility and sought modification and termination of the challenged permits after the Sierra Club filed its appeals but before a ruling on the merits. The EHB considered the Sierra Club's timing argument, noting expressly that relative timing can support a finding of causation, particularly in the absence of any other reasonable explanation. (EHB Opinion at 6.) Such was the case in *Solebury II*, an action before the EHB that two townships initiated to challenge the Department's issuance of an

---

[8] Section 1021.122(a) provides, in relevant part:

> In proceedings before the [EHB], the burden of proceeding and the burden of proof shall be the same as at common law in that the burden shall normally rest with the party asserting the affirmative of an issue. It shall generally be the burden of the party asserting the affirmative of the issue to establish it by a preponderance of the evidence.

25 Pa. Code § 1021.122(a).

14

environmental certification to the Pennsylvania Department of Transportation (PaDOT) for a state highway project. During the pendency of the case before the EHB, PaDOT redesigned the project. PaDOT also decided to ask the Department to rescind the environmental certification, which the Department did. PaDOT then moved to dismiss the townships' appeals as moot. The EHB granted that motion. On remand from the Pennsylvania Supreme Court, the EHB considered whether the townships were entitled to a fee award under Section 307(b) of The Clean Streams Law.

With respect to causation, the EHB found expressly that the townships' appeals were not, in and of themselves, a substantial cause of PaDOT's decision to redesign the project. *Solebury II*, 2008 EHB at 665. The EHB, however, reached different findings and conclusions with respect to PaDOT's decision to seek rescission of the environmental certification. Specifically, the EHB found that PaDOT had not abandoned the highway project when it sought rescission of the environmental certification. That certification, the EHB found, was necessary for the project to move forward, regardless of any redesign decision. The EHB found specifically: "The only reason that a [Department] witness could imagine why a certification holder would ask for a rescission was if the underlying project was cancelled and the certification was not, therefore, 'needed.'" *Id.* at 666-67. According to the EHB, there was never a time during the townships' appeals before the EHB where any party knew that the environmental certification at issue *would not* be needed. *Id.* at 667. For this reason, the EHB concluded that the only possible justification to seek rescission of the certification while the appeal was pending was to moot the appeals and avoid litigation. *Id.* In short, the EHB rejected as not credible the agencies' proffered reason for the rescission. *Id.* at 678-80.

15

Here, the EHB reached a different conclusion, evaluating a different body of evidence. Acknowledging that relative timing of events can support a finding of causation (*Solebury II*), the EHB considered the evidence offered by LEC to support LEC's and the Department's claim that LEC redesigned its facility to eliminate the discharge into Grassy Island Creek for purely economic and business reasons, not as a result of the Sierra Club's appeals. (EHB Opinion at 6-7.) In so doing, the EHB credited the testimony of Daniel Ewan, Vice President of an LEC-affiliated company. As the EHB found: "We have no reason to doubt Mr. Ewan's testimony that LEC was engaged in an ongoing process to try to bring down its costs, and that it was this ongoing process that led to the elimination of the discharge to Grassy Island Creek." (*Id.* at 7). As the fact finder, the EHB in *Solebury II* was entitled to give greater weight to the timing of PaDOT's request to the Department to rescind the certification than PaDOT's proffered reasons for that request. Similarly, as the fact finder here, the EHB was entitled to give greater weight to Mr. Ewan's testimony than the temporal relation between the Sierra Club's appeal and LEC's request for a permit modification and termination.

In short, we see no clear legal error in this case, as the EHB applied the catalyst test, triggered by the Pennsylvania Supreme Court's decision in *Solebury I* and upheld by this Court in *Upper Gwynedd* as a lawful standard to evaluate Section 307(b) fee applications where the applicant did not receive a favorable final ruling on the merits. In terms of the Sierra Club's challenges to the EHB's fact finding, the EHB's findings on the causation requirement of the catalyst test are supported by substantial evidence of record, particularly Mr. Ewan's testimony. We may not second guess the EHB's credibility determinations nor reweigh the evidence. Finally, although there may be a difference in results, we see

16

no inconsistency between the approach the EHB took in *Solebury II* and its approach in this case. Accordingly, we find no abuse of discretion by the EHB and will affirm its determination.

P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sierra Club,                  :
             Petitioner      :
                              :
          v.                   :     No. 563 C.D. 2018
                              :
Department of Environmental      :
Protection,                      :
            Respondent    :

# **O R D E R**

AND NOW, this 11th day of June, 2019, the Order of the Pennsylvania Environmental Hearing Board, denying Petitioner Sierra Club's application for fees and costs, is AFFIRMED.

<br>

                                     _____
                                     P. KEVIN BROBSON, Judge