**[J-13A-2022 and J-13B-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| CLEAN AIR COUNCIL, THE DELAWARE RIVERKEEPER NETWORK, AND MOUNTAIN WATERSHED ASSOCIATION, INC., | : | No. 73 MAP 2021 |
| | : | |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court Order dated |
| | : | February 16, 2021 at No. 309 CD |
| Appellants | : | 2019 Affirming the Order of the |
| | : | Environmental Hearing Board dated |
| | : | February 19, 2019 at No. 2017-009- |
| v. | : | L |
| | : | |
| | : | ARGUED:  March 10, 2022 |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| DEPARTMENT OF ENVIRONMENTAL | : | |
| PROTECTION AND SUNOCO PIPELINE, | : | |
| L.P., | : | |
| | : | |
| Appellees | : | |
| STEPHEN AND ELLEN GERHART | : | No. 74 MAP 2021 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court dated |
| | : | February 16, 2021 at No. 107 CD |
| | : | 2020 Affirming the Order of the |
| COMMONWEALTH OF PENNSYLVANIA, | : | Environmental Hearing Board dated |
| DEPARTMENT OF ENVIRONMENTAL | : | January 7, 2020 at No. 2017-013-L |
| PROTECTION AND SUNOCO PIPELINE, | : | |
| L.P. | : | ARGUED:  March 10, 2022 |
| | : | |
| | : | |
| APPEAL OF:  COMMONWEALTH OF | : | |
| PENNSYLVANIA, DEPARTMENT OF | : | |
| ENVIRONMENTAL PROTECTION | : | |

**JUSTICE WECHT**                    **DECIDED:  February 22, 2023**

The General Assembly has charged the Department of Environmental Protection ("DEP") with the authority to grant permits for activities regulated under the Clean Streams Law ("CSL").[1]  The principal responsibility for ensuring that permits have been issued properly and that the permitted activities are consistent with the CSL's mandates lies with interested citizens and organizations.  Specifically, the CSL provides that "[a]ny person or municipality adversely affected" by DEP actions may appeal to the Environmental Hearing Board ("the Board").[2]  So it falls to these individuals and entities to identify any flaws or irregularities in the approval process and to appeal DEP decisions, often at considerable expense.  The General Assembly has accordingly granted the Board discretion to shift the costs and attorney's fees associated with CSL permit appeals among the parties to those appeals.  Significantly, the statutory language neither limits nor guides the Board's discretion.  The lone qualitative textual proviso is that only "reasonable" fees may be shifted from one party to another.

Against the backdrop of this broad legislative grant of discretion, the Board has opted on its own to cabin that discretion.  Put differently, the Board has imposed strictures upon itself that address the question of when it will order one party to compensate another for fees incurred in litigating an appeal.  For example, the Board has made clear that only

---

[1]     Act of June 22, 1937, P.L. 1987, *codified as amended at* 35 P.S. §§ 691.1-691.1001.

[2]     *See* 35 P.S. § 691.7(a) ("Any person or municipality having an interest which is or may be adversely affected by any action of the department under this act shall have the right to appeal such action to the Environmental Hearing Board.").

a party which "prevails" may recover fees. The self-imposed limitation at issue in today's cases, which we consolidated for argument and which we now decide together in this Opinion, is the Board's rule that no private party to an appeal may be compelled to reimburse another party unless it has pursued or defended the appeal in bad faith or for an improper purpose.

We conclude that the to-all-appearances *per se* bad-faith standard that the Board has come to apply to any effort to recover fees against a private party is incompatible with the intent embodied in the CSL. The Board has justified its contrary view with an overbroad reading of our case law, relying upon an assumed equivalency between permit applicants and citizen objectors that we cannot reconcile with the parties' respective roles and incentives in pursuing or defending such appeals under the CSL. We further conclude that DEP should stand on an equal footing with all other parties at the outset of a fee-shifting inquiry, subject to disparate treatment only when it bears disparate responsibility for whatever prompted a successful appeal.

### I. Costs and attorney's fees under the Clean Streams Law

Our Constitution's Environmental Rights Amendment ("ERA") provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.[3]

Although the ERA is not implicated directly in this case, its mandate informs Pennsylvania's elaborate body of environmental protection statutes and regulations.

---

[3] PA. CONST. art. I, § 27 ("Natural resources and the public estate").

In this light, we turn to the "Declaration of Policy" that the General Assembly provided to explain the legislative intent behind the CSL:

(1) Clean, unpolluted streams are absolutely essential if Pennsylvania is to attract new manufacturing industries and to develop Pennsylvania's full share of the tourist industry;

(2) Clean, unpolluted water is absolutely essential if Pennsylvanians are to have adequate out of door recreational facilities in the decades ahead;

(3) It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted;

(4) The prevention and elimination of water pollution is recognized as being directly related to the economic future of the Commonwealth; and

(5) The achievement of the objective herein set forth requires a comprehensive program of watershed management and control.[4]

Thus, the CSL's ambition, as embodied particularly in its dual aim both to prevent new pollution and to rectify past damage, is not inconsiderable. The CSL is correspondingly voluminous, and it is supplemented by many regulations that further flesh out DEP's broad array of responsibilities.[5]

Our focus here is upon a single provision. At issue in these cases is Section 307, which addresses DEP permitting relative to "industrial waste discharges." Specifically, we consider the provision of Section 307 that addresses fee-shifting among parties to a permit appeal, as follows:

**35 P.S. § 691.307. Industrial waste discharges**

(b) . . . . Any person having an interest which is or may be adversely affected by any action of the department under this section may proceed to

---

[4]     35 P.S. § 691.4.

[5]     *See generally* 25 Pa. Code §§ 1.1-1021.201.

lodge an appeal with the Environmental Hearing Board in the manner provided by law, and from the adjudication of said board such person may further appeal as provided in Title 2 of the Pennsylvania Consolidated Statutes (relating to administrative law and procedure). *The Environmental Hearing Board, upon the request of any party, may in its discretion order the payment of costs and attorney's fees it determines to have been reasonably incurred by such party in proceedings pursuant to this act*. . . . [emphasis added]

We are asked in these two cases to determine whether the unbridled discretion that the General Assembly granted the Board allows the Board in turn to limit its own discretion by imposing a *per se* restriction that allows fee awards[6] only in cases in which a party's bad faith in challenging or defending a DEP permit is established.

To examine this question, we must first review several earlier decisions that touch upon the topic, beginning with the Commonwealth Court's decision in *Kwalwasser v. DEP*.[7] *Kwalwasser* involved a request for attorney's fees under a since-revised provision of Pennsylvania's Surface Mining Conservation and Reclamation Act ("Reclamation Act").[8] The language granting the Board discretion to award fees in the Reclamation Act was materially identical to the CSL's parallel fee-shifting provision.[9] We have suggested

---

[6]    As noted, Section 307 in fact authorizes the award of "costs and attorney's fees," and the distinction is important, given the potentially tremendous expense of the various inspections, analyses, and other related activities for which a party to an appeal must pay, none of which expenses fall under the ambit of "attorney's fees." Indeed, costs sometimes outstrip attorney's fees, as, evidently, was the case in *Gerhart*. For simplicity's sake, hereinafter we primarily refer to fees to stand for both costs and fees.

[7]    569 A.2d 422 (Pa. Cmwlth. 1990).

[8]    52 P.S. §§ 1396.1-1396.31.

[9]    *Compare* 52 P.S. § 1396.4(b) (which then provided that the Board "may in its discretion order the payment of costs and attorney's fees it determines to have been reasonably incurred by such party in proceedings pursuant to this section"), *with* 35 P.S. § 691.307, *supra* (same, except that the relevant language concludes by reference to "proceedings pursuant to this act").

that the analyses of various statutory fee-shifting provisions may be treated similarly, but we also have preached caution in doing so, particularly as to differently-fashioned federal environmental protection laws.[10]

In *Kwalwasser*, plaintiff-objector sought compensation for fees incurred in appealing a mining permit. The appeal involved sweeping challenges to the permit, but the objector ultimately obtained only "fleeting" success by obtaining an interlocutory order on two minor issues and a two-month permit suspension, which suspension ultimately was lifted. The objector maintained that the Board abused its discretion in denying the objector's fee application.

The Commonwealth Court first observed that the statute "vests broad discretion in [the Board] in awarding costs and attorney[']s fees," and that there are no further statutory guidelines on the subject.[11] As such, it would not overturn the Board's decision "in the absence of fraud, bad faith or a flagrant abuse of discretion," regardless of whether the court might have ruled differently on the question in the first instance.[12] The Board took it as given that, to sustain an award of fees, the objector had to "prevail," *i.e.*, achieve "some degree of success on the merits."[13] In denying fees, the Board ruled that "a final [favorable] order is a necessary prerequisite to an award of fees and costs," and that the

---

[10]     *See Solebury Twp. v. DEP*, 928 A.2d 990, 1003-04 (Pa. 2007).

[11]     *Kwalwasser*, 569 A.2d at 424.

[12]     *Id*. (citing, *inter alia*, *Mathies Coal Co. v. DEP*, 559 A.2d 506 (Pa. 1989)).

[13]     *Id*. Neither the CSL nor the Reclamation Act contains an express prevailing-party requirement. While it appears that the presumed CSL success requirement has never been challenged, we observed in *Solebury* that certain similar federal enactments limit fee awards to "prevailing parties," a limitation that Section 307 lacks. *Solebury*, 928 A.2d at 1004.

objector's apparent success, albeit embodied in a court order, proved "illusory" when the suspension was lifted.[14] The Commonwealth Court held that the Board did not abuse its discretion in determining that the objector's limited degree of success failed to establish a basis for a fee award.[15]

We weighed in on the subject for the first time in *Lucchino v. DEP*, 809 A.2d 264 (Pa. 2002), a case that also arose under the Reclamation Act. The applicant[16] there secured a DEP permit to remove coal in connection with road construction activities. Lucchino, serving as a township supervisor, voted to approve the application. But later, as a private citizen, he appealed the permit before the Board. The applicant successfully filed a motion to dismiss the appeal for want of standing because Lucchino was not individually affected by the proposed action. The applicant then filed a petition seeking costs and fees. The Board, determining that Lucchino appealed in bad faith merely to burden and harass DEP officials, awarded fees to the applicant. Lucchino appealed.

The Commonwealth Court first looked to *Kwalwasser*, distilling from that decision a four-factor rubric for determining whether fees are due:

> (1) a final order must have been issued; (2) the applicant for the fees and expenses must be the prevailing party; (3) the applicant must have achieved some degree of success on the merits; and (4) the applicant must

---

[14]   *Id*. at 425.

[15]   The *Kwalwasser* decision was not appealed to this Court.

[16]   Throughout this opinion we refer both to permit applicants and permittees—*i.e.*, applicants who received permits—as "applicants." Similarly, regardless of how they are postured for purposes of appeal or were postured in the courts below, we refer to those who challenge or appeal permits as "objectors" throughout.

have made a substantial contribution to a full and final determination of the issues.[17]

The court also acknowledged that the Board had since added a criterion to the *Kwalwasser* test when an applicant seeks fees from an *objector*—to wit, whether the objector brought the appeal in bad faith.[18]  Applying that rubric, the Board determined that the objector's conduct satisfied the bad-faith standard, and it awarded fees to the applicant.  The Commonwealth Court affirmed, taking the view that bad faith *alone* may justify an award of fees without resort to the *Kwalwasser* factors.

On appeal, this Court reaffirmed "the American Rule": absent an express agreement or statutory authority to the contrary, litigants presumptively are responsible for their own costs and attorney's fees.[19]  The Court then analyzed various statutory provisions allowing for fee-shifting.  We underscored the necessity of analyzing each such source of authority on its own terms, because the underlying policy concerns and parameters of the governing standards vary.  For example, "[a] number of statutes permit an award for enforcement of private rights granted in an enactment to promote public interests, particularly where there is a willful or intentional violation."[20]

---

[17]    *Lucchino*, 809 A.2d at 266.

[18]    *Id*. (citing *Alice Water Protection Ass'n v. DEP*, 1997 EHB 840).  Board decisions are available on Westlaw.  Decisions also may be found at https://ehb.courtapps.com/public/opinionAndAdjudicationVolumes.php.

[19]    *Lucchino*, 809 A.2d at 267; *see Mosaica Academy Charter Sch. v. Dep't of Educ*., 813 A.2d 813, 822 (Pa. 2002) ("The American Rule states that a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties or some other established exception.").

[20]    *Lucchino*, 809 A.2d at 268 (citing the Gasoline, Petroleum Products & Motor Vehicle Accessories Act, 73 P.S. § 202-6, and the Feature Motion Picture Fair Business Practices Law, 73 P.S. § 203-10).

The Court noted that review of fee awards on appeal "is limited solely to determining whether the tribunal palpably abused its discretion in making the fee award."[21] We also flagged the parallel language in the fee-shifting provisions of the Reclamation Act and the CSL, and we stated that "Pennsylvania courts have construed these statutory sections liberally 'to justly compensate parties who have been obliged to incur necessary expenses in prosecuting lawful claims or in defending against unjust or unlawful ones.'"[22]

The Commonwealth Court had derived a basis for its arguably novel bad-faith requirement by reference to analogous fee-shifting provisions of the Federal Surface Mining Control and Reclamation Act. On review, we opined that this "complicated a decision that could have been based on the language" of Pennsylvania's Reclamation Act.[23] Nonetheless, we held that the Commonwealth Court properly had decided that the objector's appeal served only as "an attack on agency employees and officials."[24] Thus, the record supported the Board's conclusion that the objector's conduct in bringing the appeal "was dilatory, obdurate, vexatious, or in bad faith," and this Court detected no abuse of discretion in the award of fees to the applicant.[25]

---

[21] *Id*. at 268-69 (citing *Thunberg v. Strause*, 682 A.2d 295 (Pa. 1996)).

[22] *Id*. at 269 (quoting *Tunison v. Commonwealth*, 31 A.2d 521, 523 (Pa. 1943)).

[23] *Id*.

[24] *Id*.

[25] *Id*. at 270.

We closed with an important caveat that suggested a distinction between fee awards for objectors who bring lawful appeals and fee awards for applicants against whom unlawful appeals have been brought:

> We do not reach this decision lightly for, as [the objector] reminds us, any grant of attorney's fees against an individual litigant in a suit against his government[] has a potential 'chilling effect' on the willingness of the ordinary citizen to pursue resolution of his disputes in the courts. However, recognizing that we must strike a delicate balance, it is equally important that this phrase not be employed to defeat the protections against frivolous suits afforded to a defendant.[26]

This closing observation signaled a recognition that the failure to remunerate meritorious citizen complainants, or the threat of easy fee-shifting against them, could subvert the CSL's principal mechanism for challenging suspect permits.

Next, in *Solebury Twp. v. DEP*, *supra*, we considered a clearer Commonwealth Court application of the *Kwalwasser* criteria to a request for fees—this time under Section 307 of the CSL. PennDOT applied to DEP for a water quality certification in connection with a proposed highway bypass, a certification that it needed in order to obtain federal approval. Objecting townships and organizations appealed the certification. DEP and PennDOT challenged the objectors' standing, but days before argument, PennDOT sought rescission of the certification from DEP and filed a motion to dismiss the challenge as moot.

The objectors then sought attorney's fees under the Costs Act[27] and the CSL. The Board analyzed the request according to the *Kwalwasser* criteria and concluded that, while the dismissal was a final order, none of the other *Kwalwasser* criteria were met.

---

[26]    *Id*.

[27]    *See* 71 P.S. § 2031-35, *expired effective July 1, 2007*.

While the objectors ended up with what they had sought, they did not prevail on the merits, as such, because the dismissal had followed from the applicant's voluntary rescission, not from an adjudication.

On appeal, the Commonwealth Court disagreed, finding that the *Kwalwasser* criteria were satisfied. With regard to prevailing-party status, because the CSL was silent, the court looked elsewhere for guidance—specifically, to the Costs Act, under which "a party may be deemed to have prevailed when an agency withdraws from or otherwise terminates a litigated controversy."[28] The objectors sought revocation and received rescission, so in practical terms they had "prevailed." Moreover, because neither DEP nor PennDOT offered another reason for the rescission, the court inferred that the objector's appeal had been its impetus. Thus, the court remanded to the Board for the calculation and award of fees.

On appeal to this Court, the validity or sufficiency of the *Kwalwasser* test itself came into question, with the objectors noting that this Court had declined to address that test's validity in *Lucchino*. Citing the concern against discouraging citizens from challenging permits under the CSL with which we had closed our *Lucchino* opinion, the objectors in *Solebury* argued that Section 307 must be construed liberally in order to compensate objectors who successfully pursue a valid claim. They did not object to the employment of the *Kwalwasser* criteria as such, but they argued that those criteria must

---

[28] *Solebury*, 928 A.2d at 996. The Costs Act provided for the award of fees and expenses for administrative agency actions, but has since expired. In its relevant form it defined a prevailing party as one "in whose favor an adjudication is rendered on the merits of the case or who prevails due to withdrawal or termination of charges by the Commonwealth Agency *or who obtains a favorable settlement approved by the Commonwealth Agency initiating the case*." *Id*. (quoting 71 P.S. § 2032) (emphasis added).

not be used in a way that inhibits Section 307's application or runs contrary to the CSL's ends. The prevailing-party criterion, they maintained, should encompass constructive success without a ruling on the merits.

The *Solebury* Court determined that the bad faith manifest in *Lucchino* rendered close examination of the reconcilability of the *Kwalwasser* criteria with Section 307's liberal fee-shifting standard unnecessary. "Section 307 does not specify on what basis petitions for counsel fees may be granted or denied, nor does the statute mandate that any such standards be created."[29] Thus, the Court deemed it "within the scope of the [Board's] prerogative to channel its discretion in awarding attorneys' fees based upon considerations such as the *Kwalwasser* criteria when there has been no finding of bad faith."[30]

Whatever standards the Board chooses to adopt, the *Solebury* Court added, those standards "cannot be interpreted to eliminate the availability of attorneys' fees to parties that may have incurred legitimate expenses."[31] Section 307 does not by its terms impose or imply a prevailing party requirement. Absent such a requirement, demanding not only practical success but also that it arrive in the form of a judgment on the merits was, for the *Solebury* Court, "untenable."[32] We indicated that success relative to the real-world result sought should weigh heavily on any prevailing-party assessment. Accordingly, the

---

[29]     *Id*. at 1003.

[30]     *Id*.

[31]     *Id*. at 1004.

[32]     *Id*.

Board's finding that dismissal signaled a lack of success on the merits was erroneous. We remanded to the Board for further fact-finding.

What we glean from these cases is, first, that any party which acts in bad faith in a permit appeal under the CSL, by dint of that act alone, exposes itself to the Board's discretionary authority to award fees against it. Second, *Kwalwasser* offers a suitable, but by no means mandatory, rubric for examining fee-worthiness in the absence of bad faith—*provided* that the criteria are not imposed so rigidly as to subvert the CSL's remedial purpose. And third—in light of, not in spite of, the breadth of fee-shifting discretion that the General Assembly saw fit to grant the Board—we will not stay our hand when the Board imposes bright-line rules (like an overly strict prevailing-party requirement) that confound the CSL's intent by making fee awards extraordinarily difficult for objectors to obtain.

## II. The cases before us

### A. *Clean Air Council v. DEP and Sunoco Pipeline*

On February 13, 2017, DEP granted twenty permits to Sunoco Pipeline ("Sunoco") in connection with its Mariner East 2 natural gas pipeline. The Clean Air Council, the Delaware Riverkeeper Network, and the Mountain Watershed Association ("Objectors") appealed each permit and sought temporary supersedeas to halt all authorized activities pending resolution of its appeals. The Board denied supersedeas.

Several months later, Objectors filed another challenge seeking to stop Sunoco's horizontal directional drilling ("HDD"), alleging spills and other concerns. The Board granted temporary supersedeas and scheduled a hearing. But before the hearing occurred, the parties reached an accord in which Sunoco agreed to address Objectors'

concerns, and they submitted a proposed stipulated order documenting their agreement, which eventually became a "corrected" stipulated order that was entered of record.

Broader challenges to the permits remained. The proceedings continued in several channels, but ultimately DEP and Objectors alone entered an agreement that did not alter Sunoco's twenty permits beyond the stipulated orders between Objectors and Sunoco. The agreement entailed only DEP concessions on several of Objectors' systemic concerns. DEP also agreed to pay Objectors $27,500 in fees. Sunoco was not a party to the agreement.

Objectors then filed a fee application against Sunoco for $228,246, comprising fees associated solely with the preliminary supersedeas proceedings and the run-up to the entry of the stipulated orders. Sunoco, in turn, sought more than $298,906.12[33] in fees from Objectors.

The Board denied both applications. Citing *Solebury*, the Board underscored its broad statutory discretion under Section 307, and recited its approach to considering private-party applications seeking fees against DEP, which entails determining "(1) whether the fees have been incurred in a proceeding pursuant to the Clean Streams Law; (2) whether the applicant has satisfied the threshold criteria for an award [*e.g.*, the *Kwalwasser* factors], and (3) if those two prongs are satisfied, [determining] the amount of the award."[34] But the Board further noted that the circumstance of private parties seeking fees from each other was "a less common situation," especially when it involved

---

[33]    Sunoco also sought, prospectively, an undetermined sum for fees associated with their fee application.

[34]    *Clean Air Council* Bd. Op. & Order at 7 (citing, *inter alia*, *Crum Creek Neighbors v. DEP*, 2013 EHB 835, 837).

an applicant requesting fees from an objector.[35]  Nonetheless, by its terms, Section 307 authorizes the Board to shift fees from one private party to another, leaving open the questions "under what circumstances should a private party be responsible for paying another private party's fees, and should different considerations come into play for awarding fees against private parties (as opposed to [DEP]) or different types of private parties (e.g. [objectors and applicants])?"[36]

The Board noted that there was no authority requiring that the standards be the same as between DEP and private parties, quoting an observation of the United States Supreme Court in a similar context: "We do not mean to suggest that private parties should be treated in exactly the same manner as governmental entities.  Differing abilities to bear the cost of legal fees and differing notions of responsibility for fulfilling the goals of the Clean Air Act likely would justify exercising special care regarding the award of fees against private parties."[37]  The Board observed that "[i]t is [DEP's] responsibility to issue defensible permits and it is [DEP's] action that [the Board] reviews."[38]

The Board next turned to *Lucchino*, in which, as the Board saw it, this Court "upheld a bad faith standard for awarding fees against a private party appellant."[39]  The Board

---

[35]     *Id*.  Board Chairman and Chief Judge Renwand, in dissent, noted that "[o]ne reason that fees are rarely sought from a permittee [as the Board Majority observed in its decision] might stem from the fact that the Board has never awarded fees against a permittee."  *Id*. at 20 n.1 (Renwand, C.J., concurring and dissenting) (the dissent is continuously paginated with the majority's opinion).

[36]     *Id*. at 7-8.

[37]     *Id*. at 8 (quoting *Ruckelshaus v. Sierra Club*, 680, 692 n.12 (1983)).

[38]     *Id*. (citing 35 P.S. § 691.5 ("Powers and duties")).

[39]     *Id*. at 9.

noted that this Court "did not limit its holding to fee awards against [objectors]," and the Board found "no compelling reason to establish different standards for different private litigants."[40]  "A heightened standard is appropriate for fee awards against appellants so as to avoid chilling constitutional rights to due process.  A heightened standard is just as appropriate for fee awards against applicants because, as private parties, applicants are just as entitled to unfettered access to due process."[41]  To hold otherwise, the Board asserted, would "dissuade" applicants from "vigorously protecting their interests" before the Board.[42]  The Board noted that, in *White Township v. DEP*,[43] it had ruled that applicants enjoy a right to participate fully in permit appeals that is not mutually exclusive of the obligation to pay legal fees to an objector that prevails in its challenge.  The Board maintained that it could find "no other credible, workable alternative to the bad faith standard" applied evenly as between objectors and applicants.[44]  The Board concluded

---

[40]    *Id*.

[41]    *Id*. (internal citation to *Lucchino*, 809 A.2d at 270, omitted).  The reference to due process is entirely the Board's coinage; *Lucchino* in no way refers to it.  *Lucchino* did not implicate the question of symmetrical application as between an applicant and an objector—nor did it provide that a *per* se bad-faith standard was mandatory as to any class of party—nor, for that matter, did it connect the bad-faith standard to due process concerns.  *Lucchino* held only that the Board did not abuse its discretion in ordering an objector who appealed in bad faith to pay fees.

[42]    *Id*. Two pages later, the Board contradicted itself when it rejected DEP's argument that the risk of fees would encourage applicants to submit more compliant permit applications.  The Board questioned whether the remote risk of fee-sharing relative to a multi-billion-dollar project would lead applicants to adjust their approach in light of other concerns militating in favor of rigor and strict adherence to the law's requirements.  *Id*. at 11 n.6.  It seems equally unlikely that the risk of fee-shifting would deter applicants from defending their permits when their enterprise depends upon them.

[43]    2005 EHB 611.

[44]    *Clean Air Council* Bd. Op. at 10.

that it may order fees against an applicant *only* if it engaged in bad faith during the course of a permit appeal.

Accordingly, the Board denied both Sunoco's and Objectors' fee applications. Objectors had not alleged Sunoco's bad faith, and "Sunoco made significant concessions that resulted in substantial changes in its HDD practices in both the corrected stipulated order and the order resolving the third petition for supersedeas."[45]  Sunoco also did not allege bad faith against Objectors in the underlying appeal.  The Board also rejected Sunoco's contention that Objectors had continued the litigation past the entry of stipulated orders resolving Objectors' issues with Sunoco in bad faith; until Objectors had resolved their issues with DEP, there was "no mechanism for simply dropping Sunoco from the case."[46]

Chief Judge and Chairman of the Board, Thomas W. Renwand, issued a concurring and dissenting opinion.  While he agreed that Objectors were not entitled to fees, he rejected the Board's foundational ruling that only private parties are subject to a bad-faith threshold condition for an award of fees, while DEP is exposed in the absence of bad faith.  Chief Judge Renwand noted that Section 307 offered no basis for granting such protections to *any* party, let alone to some parties but not others.  Conversely, the General Assembly had set divergent standards in other environmental laws.  For

---

[45]     *Id*. at 11.  These concessions compromise Sunoco's suggestion before this Court that Objectors had not "prevailed" in any relevant sense against Sunoco.  *Compare id.* ("Sunoco made significant concessions that resulted in substantial changes to its HDD practices . . . ."), *with* Sunoco's *Clean Air Council* Br. at 49 ("[T]he Objectors' appeal was resolved with the DEP through negotiations that did not involve Sunoco Pipeline and with a settlement that did not result in changes to the twenty challenged permits.").

[46]     *Clean Air Council* Bd. Op. at 16.

example, under 27 Pa.C.S. § 7708 ("Costs for mining proceedings"), an applicant may recover fees from objectors only upon a showing of bad faith, while objectors may recover fees from the applicant if it violated a statute, regulation, or permit, or created an imminent hazard, even absent bad faith, provided the objectors establish that they substantially contributed to the determination. Chief Judge Renwand also observed that a sound basis exists for granting objectors *more* protections than applicants, given the critical role objectors play in ensuring compliance with environmental laws and the disparate incentives driving objectors and applicants.

Rejecting the fairness of applying a more permissive standard to fees charged to DEP than to applicants, Chief Judge Renwand explained:

> A critical component of a model regulatory program is meaningful citizen participation. Citizens often have information that is developed in cases before the Board that was not available to either the Department or the permittee. However, the Department makes clear that the General Assembly has not allocated any funds to the Department for the payment of fee awards assessed pursuant to Section 307(b) of the Clean Streams Law. Instead, those awards are paid from the Clean Water Fund. A strong public policy argument can be made for allocating at least some responsibility for payment of attorney's fees to a permittee. This recognizes the significant role that a permittee plays both in the permitting process and in proceedings before the Board and further recognizes the financial benefit that [applicants] receive from the issuance of a permit.[47]

Chief Judge Renwand also observed that to more liberally grant fee awards against DEP than against applicants contradicts the principle that courts should assume that the legislature intended to favor the public interest over private interests.[48] In his view, the broad discretion that the General Assembly granted the Board was intended to be

---

[47]     *Id*. at 24-25.

[48]     *Id*. at 24 (citing 1 Pa.C.S. § 1922(b)).

exercised broadly in awarding fees, not as a warrant to impose rigid restrictions that minimize fee awards, especially to objectors.

Objectors and DEP filed petitions for review in the Commonwealth Court.

### B.      *Gerhart v. DEP*

Stephen and Ellen Gerhart appealed two permits that DEP granted Sunoco authorizing installation of a pipeline across their property.  At issue was what the Board found to be the improper classification of a portion of the Gerhart property as a palustrine emergent wetland when it was, in fact, a palustrine forested wetland.[49]   The misclassification had prompted Sunoco to adopt an incorrect restoration and replanting program, and the Board directed Sunoco to restore the property according to the corrected classification.  The Gerharts abandoned, or the Board denied, other claims.

The Gerharts applied to recover fees from DEP and Sunoco under Section 307— $265,976.27, comprising about $50,000 for attorney's fees and the balance in expert fees. As for Sunoco, the Board cited its *Clean Air Council* decision—which then was pending appeal in the Commonwealth Court—as establishing that objectors cannot recover from applicants absent "dilatory, obdurate, vexatious, or bad faith conduct,"[50] which the Gerharts did not allege.  Although DEP asserted that there were "errors" in Sunoco's wetland data sheets, DEP also did not allege bad faith or fraud.  Accordingly, the Board denied the Gerharts' claim against Sunoco.

As to DEP, the Board turned to the *Kwalwasser* criteria.   First, the Board determined that the fees were incurred in a proceeding pursuant to the Clean Streams

---

[49]      The technical difference is irrelevant to this appeal.

[50]      *Gerhart* Bd. Op. at 3-4.

Law.  The Board further noted that neither DEP nor Sunoco disputed that the Gerharts had met the remaining criteria: they obtained a final order in which they prevailed on the wetland classification issue, and the Gerharts' efforts were the sole impetus for that order.

Thus, the Board moved to step three in its umbrella rubric, assessing the amount of reasonably incurred fees that DEP should remit to the Gerharts.[51]  The Board found that the Gerharts achieved only a "limited degree of success in the context of their appeal":[52] though they had prevailed on one claim, the others had failed.

The Board also stated that the parties' conduct in litigation, including in settlement discussions, "play[ed] a major role" in its assessment.[53]  Sunoco attempted several times

---

[51]     The Board recited the factors it uses to assess the amount of a fee award:

- The fee applicant's degree of success;

- The extent to which the litigation brought about the favorable result;

- The fee applicant's contribution in bringing about the favorable result;

- The extent to which the favorable result matches the relief sought;

- Whether the appeal involved multiple statutes;

- Whether litigation fees overlap fees unrelated to the litigation itself;

- How the parties conducted themselves in the litigation, including in regards to settlement;

- The size, complexity, importance, and profile of the case; [and]

- the degree of responsibility incurred and risk undertaken.

*Id*. at 5-6 (citing *Hatfield Twp. Mun. Auth. v. DEP*, 2013 EHB 764, 781).

[52]     *Id*. at 8-9.

[53]     *Id*. at 9.

to settle, proposing as early as September 2017[54] to restore the wetland according to the Gerharts' claim. But the Gerharts persisted with their claims for another two years, only to obtain precisely the relief that Sunoco had offered two years earlier. By the Gerharts' own admission, they had continued the litigation to "correct a programmatic error in how wetlands are protected in Pennsylvania."[55] "Whether or not this ill-fated attempt at *noblesse largesse* was a rational position," the Board opined, "we do not believe it is a position that the taxpayers should be required to underwrite."[56] The Board declined to address the broader theory because it was unnecessary to dispose of the Gerharts' appeal. Even if the Gerharts *had* prevailed on that theory, they would have gained no greater benefit than Sunoco had offered in 2017. Their "unnecessary effort to expand the law into wholly new territory only to get to the same place does not justify a fee award."[57]

The Board determined that the only fees that DEP owed the Gerharts were those incurred before September 2017. After reviewing the fee items corresponding to work performed before that point in the litigation, the court awarded $8,482.50 in legal fees and $4,653.27 for expert fees—the latter a small fraction of the Gerharts' ask, because the bulk of that expert work primarily supported the Gerharts' broader theory, not the wetland classification issue.

---

[54] The Board rendered a final adjudication of the wetlands challenge in September 2019.

[55] *Id*. at 10.

[56] *Id*.

[57] *Id*. at 11.

The Board having excused Sunoco from fee liability for want of bad faith, while denying DEP the same heightened standard, DEP filed a petition for review in the Commonwealth Court challenging the application of disparate standards.

### C. *The Commonwealth Court decisions*

The principal thrust of the petitions for review filed by the appellants in both cases (Objectors and DEP in *Clean Air Council*[58] and DEP in *Gerhart*) is that the Board applied an incorrect standard to determine when fees may be due among DEP and private parties. In *Clean Air Council*, the Board extended *Lucchino* and *Solebury* to rule that, like an objector, an applicant may be charged fees only if it acts in bad faith. In *Gerhart*, citing its own decision in *Clean Air Council*, the Board reaffirmed the bad-faith rule for private parties, maintaining that only DEP could be charged under Section 307 in the absence of bad faith.[59]

In *Clean Air Council*, Objectors argued that the Board should have employed the "catalyst test" for determining whether they were entitled to fees from Sunoco under Subsection 307(b) rather than the bad-faith standard that the Board derived from *Lucchino*. The catalyst test derives from the *Solebury*'s Court's approving citation of

---

[58] In *Clean Air Council v. DEP*, 245 A.3d 1207 (Pa. Cmwlth. 2021) (*en banc*), the court determined that DEP lacked standing to appeal the Board's ruling because: (1) it was not aggrieved in the traditional sense because, having settled with Objectors, no additional fees had been charged to it; (2) although it is subject to a "relaxed" standing doctrine pursuant to the Administrative Agency Law, *see* 2 Pa.C.S. § 702, and had participated in the litigation, it had failed formally to intervene in the matter before the Board; and (3) despite its general enforcement authority under the CSL, its only interest in *Clean Air Council* was prospective. *Clean Air Council*, 245 A.3d at 1212-15. We need not review this decision, and express no opinion on the Commonwealth Court's analysis, because DEP undisputedly has standing in *Gerhart* to pursue the same arguments.

[59] *DEP v. Gerhart*, 107 C.D. 2020, 2021 WL 563313, at *3 (Pa. Cmwlth. Feb. 16, 2021) (memorandum).

Justice Ginsburg's dissenting opinion in *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources*.[60] There, Justice Ginsburg opined that a formal, favorable judgment is not required in order to attain prevailing-party status because, at least in certain circumstances, "the ultimate goal of litigation is not an arbiter's approval, but a favorable alteration of actual circumstances."[61] As the Commonwealth Court has observed, we held in *Solebury* that, "if and when applying the *Kwalwasser* standard under Section 307(b) of the [CSL, the Board] should not limit its consideration of whether a party 'prevailed' to situations in which a party obtains an actual judgment or consent decree."[62] Objectors in *Clean Air Council* believed that their settlement agreement with DEP should not preclude Sunoco's fee liability where Sunoco had made various negotiated adjustments to its permits and practices during the course of the litigation; Objectors had succeeded at least to some degree.

Sunoco disagreed. While it made some effort to argue the bad-faith standard's propriety as developed in case law, it also ventured several policy points: DEP is solely

---

[60]     532 U.S. 598 (2001).

[61]     *Id*. at 633 (Ginsburg, J., dissenting).

[62]     *Upper Gwynedd Towamencin Mun. Auth. v. DEP*, 9 A.3d 255, 264 (Pa. Cmwlth. 2010). Justice Ginsburg, dissenting in *Buckhannon*, did not particularize the "catalyst" test, but the court in *Upper Gwynedd* offered the following distillation:

> (1) the applicant must show that the opposing party provided some of the benefit the fee-requesting party sought in the underlying suit, (2) the applicant must show that the suit stated a genuine claim, and (3) the applicant must show that the suit was a substantial or significant reason why the opposing party, voluntarily or otherwise, provided the benefit or partial benefit that the fee[-]requesting party sought in the underlying suit.

*Id*. at 264-65.

responsible for enforcing the CSL; when a permit is appealed, the Board reviews DEP's approval, not the actions of the permittee in seeking the permit; and the catalyst test is difficult to apply with consistency.

The Commonwealth Court in *Clean Air Council* first recited its take on the standard of appellate review for Board decisions, which it limited categorically to determining whether the Board abused its discretion.[63] Mere disagreement with the Board's reasoning or disposition will not, without more, warrant reversal. The Board abuses its discretion only when "the law is overridden or misapplied or the judgment exercised is manifestly unreasonable or is the result of partiality, prejudice, bias, or ill will."[64] Then, the court reviewed *Lucchino* and *Solebury*, from which it concluded that Objectors were incorrect that the catalyst test was "the sole and exclusive standard that [the Board] may employ in disposing of a request for costs and fees against a permittee under Section 307(b)."[65] The court observed—as we did in *Solebury*—that "[the Board's] 'broad discretion includes the authority to adopt standards by which [it] will evaluate applications for costs and fees.'"[66] Thus, "it was entirely within [the Board's] discretion, and eminently

---

[63]    *Clean Air Council*, 245 A.3d at 1216 (citing *Sierra Club v. DEP*, 211 A.3d 919, 924-25 (Pa. Cmwlth. 2019)); *see Solebury*, 928 A.2d at 997 n.8.

[64]    *Clean Air Council*, 245 A.3d at 1216.

[65]    *Id*. at 1218.

[66]    *Id*. (quoting *Sierra Club*, 211 A.3d at 926). In *Sierra Club*, the Commonwealth Court upheld the Board's requirement that an objector prove by a preponderance of the evidence that its appeal, rather than any other consideration, caused the result as to which fee awards were sought. Tying the causation matter to the third factor in the catalyst test, the court opined that, "[i]f the salient purpose of the fee shifting provision in the [CSL] is to compensate those that challenge governmental actions to advance public policy objectives, . . . it is both reasonable and consonant with that purpose for the [Board] (continued…)

appropriate, to apply the instant bad faith standard in deciding whether or not to impose costs and fees upon a private party permittee."[67]

Judge Ceisler dissented[68] from the Majority's adoption of a bad-faith requirement for charging fees against applicants. She noted that, while the court in *Sierra Club* generally supported the Board's discretion to adopt standards, it also observed that "[s]uch standards . . . must be consistent with 'Pennsylvania's strong public policy to justly compensate parties that challenge agency actions by liberally interpreting fee shifting provisions.'"[69] A bad-faith requirement, she opined, "does not square with the public policy purpose underpinning Section 307(b)'s fee-shifting language."[70] Moreover, it would be unfair to expose DEP to fees arising from actions involving "inadvertent mistakes or good faith, negotiated compromises or settlements, while [an applicant] could get off scot-free under similar circumstances" for want of bad faith.[71] Having rejected the asymmetrical treatment of DEP and applicants, Judge Ceisler further expressed

---

to require a fee applicant to show that . . . its legal challenge caused, at least in part, the favorable outcome that the applicant sought." 211 A.3d at 926

[67] *Clean Air Council*, 245 A.3d at 1218.

[68] Then Judge, now Justice Brobson (who is not participating in this case) wrote a concurring opinion. He supported the Majority's view that the Board's employment of the bad-faith standard was "eminently appropriate," but only because the lack of statutory standards imposed upon the Board's discretion left it "without legislative guardrails." *Id*. at 1218 (Brobson, J., concurring). But he added that he saw "no reason why 'bad faith' should be the only test," and declined to endorse such a restrictive view. *Id*. at 1219

[69] *Id*. at 1220 (Ceisler, J., concurring and dissenting) (quoting *Sierra Club*, 211 A.3d at 926).

[70] *Id*.

[71] *Id*.

misgivings about the rote *symmetrical* treatment of objectors and applicants, questioning whether the chilling effect on objectors that this Court flagged in *Lucchino* and *Solebury* would, in fact, affect applicants in the same way it would objectors, given that the two species of litigants operate under entirely different incentive structures.

A different panel of the Commonwealth Court similarly disposed of the Gerharts' appeal in their separate litigation in a non-precedential decision.[72]  Because the court disposed of that case briefly, by reference to *Clean Air Council*, we need not examine it in separate detail.

### III.    Discussion

The principal question as to which we granted review invites a broad-spectrum examination of the Board's employment of rigid standards in assessing fee-shifting applications under the CSL, followed by an inquiry concerning whether disparate standards should be applied depending on who is the target of a fee application.[73]  Our

---

[72]    *See Gerhart*, *supra*.

[73]    In *Clean Air Council*, we granted review of the following questions raised by Objectors:

   1) Did the Commonwealth Court err by reviewing a pure question of law using the abuse of discretion standard of review rather than the legal error standard, contrary to [*Solebury*, *supra*], *Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1 (Pa. 2011), and *DEP v. Bethenergy Mines*, 758 A.2d 1168 (Pa. 2000)?

   2) Did the Commonwealth Court err in adopting a new standard for fee awards under Section 307(b) of the Clean Streams Law, 35 P.S. § 691.307(b), where that standard sets aside this Court's holding in [*Solebury*] and ignores the text and purpose of the law?

In *Gerhart* we granted review of the following issue raised by DEP:

   Did the Commonwealth Court err in casting aside the *Kwalwasser* test as the proper standard for attorney fee liability in favor of a "Bad Faith"
(continued…)

answer to the first question effectively answers the second. But the threshold issue upon which we granted review requires us first to determine the appellate standard of review.

### A. Abuse of discretion or *de novo* review

The Commonwealth Court purported to review the Board's decisions *strictly* for an abuse of discretion. Its rationale for doing so was twofold—first, it is the most common standard of review when an appellate court reviews administrative action; and second, Subsection 307(b) itself provides that the Board "may *in its discretion* order the payment of costs and attorney's fees it determines to have been reasonably incurred" by the requesting party, its use of the term "discretion" almost as suggestive as the lack of *qualification* it imposes upon that discretion.[74] The countervailing view is that, in determining the breadth of the Board's prerogative to substantially or categorically restrict fee awards, we must engage in statutory interpretation, an enterprise that we always conduct *de novo*.

In support of *de novo* review, Clean Air Council cites, among other cases, *Bethenergy Mines*, *supra*, in which we reviewed *de novo* whether a party that successfully defends a DEP enforcement action is entitled to seek attorney's fees under the Mine Subsidence Act.[75] It also notes that, in *A. Scott Enterprises*, this Court reviewed *de novo* whether a fee-shifting provision in the Commonwealth Procurement Code—which

---

standard that effectively requires the public to be solely responsible for citizen fees in all matters arising under *s*ection 307(b) of the Clean Streams Law?

*Clean Air Council v. DEP*, 264 A.3d 335 (Pa. 2021) (*per curiam*).

[74]   35 P.S. § 691.307(b) (emphasis added).

[75]   *See* Clean Air Council's Br. at 31 (citing *Bethenergy Mines*, 758 A.2d at 1174).

provided that a party in a relevant proceeding "may be awarded a reasonable attorney fee" if the government acted in bad faith—could be converted into a mandate by the lower courts, in effect reading "*may*" as "*shall*."[76]  And in *Solebury,* albeit perhaps without quite saying so, we addressed the Board's prevailing-party rule *de novo*.  There, we held that the Board may adopt standards for reviewing fee applications, but "such standards cannot be interpreted to eliminate the availability of attorney's fees."[77]

Sunoco argues that the Court presently does not face a "direct question[] of statutory interpretation," such as a "threshold legal question[] of whether the Objectors' action was decided under the CSL."[78]  Sunoco also underscores our observation in *Solebury* that "the plain language of Section 307 does not specify on what basis petitions for counsel fees may be granted or denied, nor does the statute mandate that any such standards be created."[79]

Although Sunoco effectively concedes that we approached the interpretive question in *Solebury de novo*, it attempts to distinguish that case.  In *Solebury*, it argues, the Court confronted the threshold question of whether fees were due *at all—i.e.*, whether a given case was a "proceeding pursuant to [the CSL]," a pre-condition for an award of

---

[76]     *Id*. (citing *A. Scott Enters., Inc,. v. City of Allentown*, 142 A.3d 779 (Pa. 2016)) (emphasis added).

[77]     *Solebury*, 928 A.2d at 1004; *see id*. at 1005 ("[T]he [Board's] application of the *Kwalwasser* criteria in the present matter was too narrow in view of the broad language of Section 307 and the public policy favoring liberal construction of fee-shifting provisions . . . .").

[78]     Sunoco's *Clean Air Council* Br. at 19.  Because Sunoco and DEP have filed distinct if materially similar briefs in both of these cases, when citing their briefs we identify them by caption.

[79]     *Id*. at 20 (quoting *Solebury*, 928 A.2d at 1003).

fees under Subsection 307(b).[80] Here, by contrast, the question isn't whether the case arises under the CSL subject to potential Section 307 fee-shifting as such, but whether a fee award is due under these circumstances, precisely the determination entrusted to the Board's discretion. Put another way, Sunoco argues that we are confronted not with an interpretive question, but merely a question pertaining to Subsection 307(b)'s application in *this* case.[81]

It is the very essence of judicial review that, when the meaning of a Pennsylvania statutory text comes into question, this Court has the final word.[82] While Sunoco is correct that *de novo* versus abuse-of-discretion review generally tracks the distinction between the interpretation of a rule and its application, its effort to persuade us that these cases implicate application rather than interpretation is unpersuasive.

As in *Solebury*, we are asked not whether the Board *abused* the discretion the General Assembly undisputedly granted it in awarding fees, but whether it *exceeded* that discretion in imposing a blanket restriction upon such awards. That is a question of statutory interpretation. In *Solebury*, we plainly considered whether the Board had exceeded (rather than abused) its statutory discretion by imposing a strict prevailing-party

---

[80]     *Id*. at 21.

[81]     Sunoco's clean binary between interpretation and application echoes *Solebury*, where we indicated that determining whether the particular certification at issue was subject to fee-shifting under Section 307 was an interpretive question subject to *de novo* review but added that, "[i]n considering the propriety of an award of counsel fees . . . appellate review is limited to determining whether the fee award constituted an abuse of discretion." 928 A.2d at 997 n.8.

[82]     *See SEDA-COG Joint R. Auth. v. Carload Express, Inc.*, 238 A.3d 1225, 1242 (Pa. 2020) (rejecting the proposition that a court may intervene against discretionary acts of municipal authorities only for an abuse of discretion, and noting that statutory interpretation is "a function entrusted to the judiciary").

test. Even as we acknowledged that the determination whether to award fees is subject to an abuse-of-discretion standard, we approached the fitness of the standards the Board adopted as a matter of statutory interpretation, as evinced especially in our closing caveat concerning the importance of not administering Section 307 in a fashion that might deter the citizen enforcement upon which effective CSL enforcement depends.

This is not to downplay the risk of infringing upon the Board's discretion. *Lucchino*, *Solebury*, and now this Opinion exemplify how gingerly we approach the line where a statutory question gives way to an exercise of discretion (or vice-versa). The General Assembly indisputably granted the Board great latitude to grant fees based upon the equities of a given case, and we are loath to intrude upon it. But the question of the Board's *prudential* discretion to narrow its *statutory* discretion is a question of law that we review *de novo*.

### B.     The bad-faith approach to Section 307 fee awards.

*Lucchino* and *Solebury* enshrined certain principles that are not contested by the parties here. First, the CSL is a remedial statute, the goal of which is to protect Pennsylvania's environment from activities that contaminate the waters of our Commonwealth. Second, we must construe the methods by which the Board administers the fee-shifting provision that the General Assembly incorporated into the CSL in service of those ends. Third, the Board may adopt standards to guide and regularize its resolution of fee-shifting requests, but it must not adopt standards which undermine the critical role that fee-shifting plays in the legislature's calculus in fashioning the CSL.

The lone standard that this Court has endorsed to date is that the Board *may* recognize bad faith alone as a basis upon which to assess fees against an applicant or

an objector.[83]  But we have never suggested that this is the best or the only standard. Quite contrarily, the *Solebury* Court observed that "it is within the scope of the [Board's] prerogative to channel its discretion in awarding attorneys' fees based upon considerations such as the *Kwalwasser* criteria *when there has been no finding of bad faith or vexatious conduct*."[84]

The lone standard that we have *rejected* was the Board's formalistic prevailing-party requirement, which allowed for fee-recovery only by a party who obtained a favorable final judgment on the merits.[85]  While we did not reject the *Kwalwasser* approach as such, we found that the Board's rigid *application* of *Kwalwasser*'s prevailing-party requirement had imposed a restriction that was neither prescribed by nor compatible with, the CSL's text or design.

Once again, we measure the fitness of a standard that the Board has chosen to place upon the facially standardless Section 307.  When we interpret a statute, we aim "to ascertain and effectuate the intention of the General Assembly."[86]  Where the language of a statute is plain and unmistakable, we interpret it accordingly.[87]  We also may presume, among other things, "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable," and that it "intends the entire

---

[83]    *See Lucchino*, *supra*.

[84]    *Solebury*, 928 A.2d at 1003 (emphasis added).

[85]    *See generally id*.

[86]    1 Pa.C.S. § 1921(a).

[87]    *Id*. § 1921(b).

statute to be effective and certain," and that it "intends to favor the public interest as against any private interest."[88]

We also may seek the General Assembly's intention by examining:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.[89]

Section 307's grant of discretion appears to be exceptionally broad. Sometimes what seems clear is only so by virtue of the reader's close proximity to the particular text in question, especially when the text uses a word like "discretion"—which is as familiar as it is broad, at least to jurists, for whom the word frequently tolls. But some words are more common than they are clear, or are by virtue of their malleability fated to highly context-specific adjudication. "Discretion" is one such word.[90] So we must interpret the

---

[88]     *Id*. §§ 1922(1)-(3).

[89]     *Id*. § 1921(c).

[90]     Then-Judge, now Justice Brobson insightfully suggested below that the discretion which the legislature conferred upon the Board in Section 307 might be *so* broad as to implicate non-delegation problems of constitutional dimension. *See Clean Air Council*, 245 A.3d at 1219 (Brobson, J., concurring) ("There are no standards in [Section 307] or elsewhere to cabin the [Board's] discretion. Without standards, Section 307(b) of the [CSL] might run afoul of Article II, Section 1 of the Pennsylvania Constitution, which vests within the General Assembly the exclusive authority to make laws."). But as Justice (continued…)

language in question "not in isolation, but with reference to the context in which it appears."[91]

For present purposes, these generally applicable principles are supplemented by a body of law that has cropped up around statutory fee-shifting provisions. In *Tunison*, we held that "[t]he courts of this Commonwealth have adopted the policy that statutes relating to costs are to be liberally interpreted in order to justly compensate parties who have been obliged to incur necessary expenses in prosecuting lawful claims or in defending against unjust or unlawful ones."[92] And in *Lucchino*, reaffirming *Tunison*, we extended that principle to fee-shifting provisions in environmental protection statutes.[93] Precisely because the American Rule is the governing paradigm for the vast preponderance of litigation across the United States, we take special note when the legislature breaks with tradition. We seek its purpose for doing so.

The Board, however, persists in taking a view of Section 307 more parsimonious than the one that this Court has adopted.[94] And the Commonwealth Court, relying in part upon its abuse-of-discretion approach and in part upon its substantial agreement with the

---

Brobson acknowledged, that issue was not presented below and is not relevant to the issues we granted for review. Thus, any consideration of the topic must await another case.

[91]     *Commonwealth v. Kingston*, 143 A.3d 917, 922 (Pa. 2016).

[92]     31 A.2d at 523.

[93]     *Lucchino*, 809 A.2d at 269.

[94]     As Chief Judge Renwand concluded, "The courts have stated over and over again that the Board has broad discretion to award attorney's fees, and time and time again the Board has failed to heed this directive." *Clean Air Council* Bd. Op. at 25 (Renwand, C.J., concurring and dissenting). We agree.

Board's reasoning, now has ruled similarly. Under the Commonwealth Court's approach, it seems that very little that the Board might do in this regard could ever justify appellate intervention.

Both tribunals' views derive from a flawed perspective on the CSL and an unduly narrow reading of our prior rulings. First, they both read *Lucchino* and *Solebury* as embracing bad faith not only as the governing rule for fee awards against objectors but also, by necessary implication, against applicants. Without clear warrant or analysis, both allude to due process concerns, suggesting that a party who might be held responsible for a counterparty's fees even if the first party did not act in bad faith would be so severely deterred from defending its interests that it would suffer a due process violation. There are obvious deficiencies in this proposition. First, due process focuses primarily upon the opportunity to defend one's interests, but it is not implicated simply by the risks and burdens attendant to defending against claims made in litigation. Second, as the Board itself acknowledged, the deterrent effect of fee-shifting against applicants may not add any "real marginal incentive" when millions or even billions of dollars await at the end of the bureaucratic road.[95]

DEP and Clean Air Council ask this Court to compare the absence of any bad-faith standard in the statutory language to 27 Pa.C.S. § 7708's similarly-worded mining permit provision, which delineates when and under what circumstances fees may be awarded to objectors from mining permit applicants, to objectors from DEP, to applicants from

---

[95] *Id*. at 11 n.6.

DEP, and to applicants from objectors.[96]  There, the General Assembly drew a clear distinction between "private and public entities" that finds no corollary in Subsection 307(b).  They assert that this Court cannot disregard what we must assume was the legislature's intentional choice to impose such a limiting standard in the coal-mining context but to exclude any similar requirement under the CSL.

Sunoco responds that the CSL's comparative silence regarding disparate standards by class of party neither requires that the standard be the same for both DEP and applicants nor precludes the bad-faith limitation.  That the General Assembly declined to draw such express distinctions in the CSL indicates only that the legislature delegated the responsibility for fashioning any such restrictions to the Board.

DEP also suggests that the Board's interpretation implicates at least one other CSL provision: Subsection 601(c) of the CSL entitles any person to file a civil action to compel an applicant's compliance with the CSL, or associated regulations or permits, or to compel DEP to enforce compliance.  Subsection 601(g) provides that the court "may award costs of litigation . . . to any party, whenever the court determines such award is

---

[96]    DEP's *Gerhart* Br. at 19-20.  DEP cites 27 Pa.C.S. § 7708.  Subsection 7708(c)(1) provides that any party may recover fees from a permittee if the Board finds that the party "made a substantial contribution to the full and fair determination" that the applicant violated a Commonwealth coal mining act, regulation, or permit, or that the permittee caused an imminent hazard.  Subsection (c)(2) provides for discretionary fee awards from DEP to any party *except* a permittee who participates in a proceeding concerning coal mining activities and who "[p]revails, in whole or in part, achieving some degree of success on the merits," provided the party made a substantial contribution to a determination of the issues.  Conversely, under Subsection (c)(3), a permittee may recover from DEP only if it shows that DEP sanctioned or issued a cessation order against a permittee "in bad faith and for purposes of harassing or embarrassing the permittee." Similarly, Subsection (c)(4) allows an applicant to recover from any party who participated in such a proceeding in bad faith or to harass the applicant.

appropriate."[97]  Given the similarly unqualified discretion furnished by Sections 307 and 601, DEP suggests that any limitations that the Board fashions for Section 307 discretion logically would extend to Section 601.  If so, a citizen "could initiate a suit against a private party permittee, demonstrate that the permittee was violating the law, obtain a court order correcting the violation, reasonably incur fees in the prosecution of its case, and still not be able to recover those fees and costs so long as the violator did not engage in bad faith . . . in the course of the litigation,"[98] all in derogation of the General Assembly's effort to mitigate the deterrent effect of litigation costs on citizen plaintiffs.

In contrast with the prevailing rule that we must construe fee-shifting provisions liberally in furtherance of the statutes in which they appear, DEP submits that "[i]t is not hyperbole to suggest that the Board could not have envisioned a more conservative interpretation of Section 307(b)" than that at which the Board arrived here—shy, perhaps, of adopting the position that it would never award fees under the statute.[99]  Thus, the Board continues to confound *Solebury*'s caveat that, while the Board may adopt

---

[97]     35 P.S. § 691.601 ("Abatement of nuisances; restraining violations").

[98]     DEP's *Gerhart* Br. at 30; *see Clean Air Council*, 245 A.3d at 1220 (Ceisler, J., concurring and dissenting).

[99]     DEP's *Gerhart* Br. at 27.  As noted earlier, Chief Judge Renwand observed that "the Board has never awarded fees against a permittee."  *Clean Air Council* Bd. Op. & Order at 20 n.1 (Renwand, C.J., concurring and dissenting).  The Dissent's certainty that such fees are not sought simply out of indifference to recovering the tremendous expense of litigation from any available party—including, sometimes, the party most responsible for its necessity—rather than because time has proven it a fool's errand to try is curious, to say the least.  *See* Diss. Op. at 4 n.1.

standards, those standards may not "eliminate the availability of attorneys' fees to parties that may have incurred legitimate expenses."[100]

The statutory language is broad. It can be read as intending to confer precisely the unfettered authority to award or not award fees not only on a case-by-case basis, but categorically by instituting a *per se* bad-faith requirement—or even by deciding to reject fee awards entirely, had we not made clear in *Solebury* that to go that far is impermissible. But it also may be read to imply that the discretion to award fees case by case must remain broad and available to the Board in each individual case that comes before it, subject to no blanket limitation not found in the statute.

Although the *Lucchino* Court upheld the award of fees against the objector, it did so with palpable reticence concerning the potential chilling effect of awarding fees against objectors, upholding the fee award there only because of the obvious egregiousness of the objector's conduct in that case. Furthermore, we agree with Chief Judge Renwand and Judge Ceisler that the chilling effect as to which the *Lucchino* Court urged caution, which we noted as well in *Solebury*, does not apply in the same way, if at all, to an applicant market-incentivized to defend its permits. For an applicant, the permitting process, including the defense against permit challenges, is a foreseeable (and hence internalized) cost of doing business. The *Solebury* Court provided ample support for a narrow reading of *Lucchino* when it observed that our decision there merely upheld the

---

[100]    DEP *Gerhart* Br. at 28. (quoting *Solebury*, 928 A.2d at 1004); *cf. Clean Air Council* Bd. Op. at 25 (Renwand, C.J., concurring and dissenting) ("[T]he Pennsylvania Supreme Court and Commonwealth Court have given the Board clear and specific direction on how we should evaluate an application for attorney's fees, and time and time again the Board has failed to heed this directive.").

application of a bad-faith standard where circumstances warranted, while signaling some support for the application of the *Kwalwasser* criteria in the absence of bad faith.

The parties also support their respective positions by reference to various policy considerations. The Gerharts contend that the authors of the secondary Commonwealth Court opinions in *Clean Air Council* agreed that a rigid bad-faith standard as to private parties was inconsistent with the legislative policy embodied in the CSL. Judge Ceisler, for example, observed that:

> Requiring a showing of bad faith in this kind of situation does not square with the public policy purpose underpinning Section 307(b)'s fee-shifting language. To state the obvious, a permittee necessarily plays a critical role in the permitting process, for without an initial permit application there would be no reason for subsequent litigation initiated by a third party. It does not therefore seem reasonable that, in theory, the DEP could be saddled with fees and costs in response to inadvertent mistakes or good faith, negotiated compromises or settlements, while a permittee could get off scot-free under similar circumstances unless it has conducted itself in a dilatory, obdurate, or vexatious way.[101]

The Gerharts also cite the Board's 1997 decision in *Alice Water*,[102] in which it observed that the CSL's interests are best served by a regime under which objectors may recover fees when they prevail in any meaningful sense, while they should be *subject* to fees only

---

[101] *Clean Air Council*, 245 A.3d at 1220 (Ceisler, J., concurring and dissenting). The quotation that the Gerharts select from then-Judge Brobson's concurring opinion is less convincing relative to the proposition for which they cite it. Justice Brobson did not weigh in on any question of policy as such—he offered merely that he saw "no reason why 'bad faith' must be the only test," and he declined to endorse it as a blanket rule. *Id*. at 1219 (Brobson, J., concurring).

[102] 1997 EHB 840.

when they bring an appeal in bad faith, as in *Lucchino*, which cited *Alice Water* for precisely that proposition.[103]

This Court has recognized that the CSL serves to "vindicate the constitutional entitlement of the citizenry to a clean environment."[104] The CSL itself underscores the General Assembly's ambitions; it was the legislature's stated objective "not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently

---

[103] The Gerharts' argument digresses into subjects that have no apparent bearing on the specific questions of law as to which we granted review. In particular, the Gerharts dispute at length how the Commonwealth Court applied the ten-factor test to determine the modest fee award against DEP and to address aspects of the expert analyses. The connection between these issues and the questions we took up is unclear.

The Gerharts also clearly misunderstand Pa.R.A.P. 2139. That rule allows parties before this Court to "prepare new briefs in the Supreme Court according to these rules, setting forth also the order allowing the appeal, or [to] utilize the briefs, if available, used in the appellate court below (changing the cover, however), and adding thereto the order allowing the appeal, the opinion and dissenting opinions, if any, of the appellate court below . . . and such additional argument as may be desired." While this rule permits parties before this Court, in effect, to copy and paste their lower-court arguments, they still must be reproduced in full. We emphasize that Rule 2139 does not, as the Gerharts claim, give a party "the right" to "incorporate by reference" a section of the party's argument below—here, relative to the proposition that "The Department Should Not Be Rewarded for Running Away from Inspecting the Gerhart Property Under Some False Expectation of Privacy." Gerharts' Br. at 23. *See*, *e.g.*, *Commonwealth v. Briggs*, 12 A.3d 291, 342 (Pa. 2011) ("'[I]ncorporation by reference' is an unacceptable manner of appellate advocacy for the proper presentation of a claim for relief to our Court."); *Pines v. Farrell*, 848 A.2d 94, 97 n.3 (Pa. 2004) ("[T]his Court is not obliged to root through the record and determine what arguments, if any, [a party] forwarded below . . . .").

[104] *EQT Prod. Co. v. DEP*, 181 A.3d 1128, 1147 (Pa. 2018).

polluted."[105] And in *Solebury*, this Court recognized Section 307 as "a fee-shifting provision in a remedial statute intended to vindicate the public's interest in clean water."[106]

Nor, as Sunoco argues, is it sufficient that DEP is not protected by the bad-faith standard, offering an objector an easier source of fees. Spreading among all other citizens the costs that one citizen incurs vindicating the public interest in clean water—or leveraging funds that DEP collects in furtherance of enforcement that do not derive directly from the general fund, which nonetheless are constructively public monies insofar as DEP serves the self-same public[107]—still leaves the party who most benefits from the permitted activities seldom if ever responsible for bearing the costs associated with revealing and correcting that party's own errors and oversights in the application process. In this regard, Clean Air Council aptly observes that the Board's application of the CSL in this context favors private interests over public ones. And a citizen who is skeptical that he or she will be able to recover the considerable expenses incurred in taking on a corporate applicant with both sunken costs and projected profits to protect and a

---

[105] 35 P.S. § 691.4(3).

[106] Clean Air Council's Br. at 40 (citing *Solebury*, 928 A.2d at 1002). Clean Air Council notes that the Superior Court has observed that "the inclusion of a fee-shifting provision in a remedial statute signals the General Assembly's intent to encourage potential plaintiffs to seek vindication of important rights and to deter defendants from violating those rights." *Id*. (quoting *Krebbs v. United Refining Co.*, 893 A.2d 776, 788 (Pa. Super. 2006) (cleaned up)).

[107] We should not assume—nor do we—that the only public interest at issue is the management of public funds. The public also has a collective interest in strict compliance with environmental regulations, and if applicants' exposure to fee awards is equal to DEP's, it may well be the case that (a) objectors are more likely to step forward, recognizing a second avenue for recovery of their outlays and (b) applicants will be more punctilious in preparing their plans and applications and in adhering to their permits' requirements. These considerations, were they apt to any degree, also would serve the public interest.

government agency postured to defend rather than interrogate its own prior permits[108] is a citizen far less likely to step up in service of protecting Pennsylvania's environmental resources.

We agree with DEP that its exclusive authority to issue permits does not bear upon the issue in this case, which isn't whether DEP should be responsible for objectors' fees, but whether applicants should share in that responsibility on a more or less equal footing. Given DEP's limited (and public) resources and the complexity of the many permit applications involved in multi-million or billion-dollar projects with innumerable moving parts, some degree of reliance upon the accuracy and veracity of the permittee's presentations is inevitable. Against this backdrop, Sunoco's attempt to minimize its own role in the permitting process is problematic at best.

In this regard, Sunoco argues that the *Clean Air Council* litigation illustrates that a bad-faith standard is fairest vis-à-vis applicants. Sunoco notes that, after two years of litigation, and no Board decisions that adversely affected Sunoco's permits, the case terminated with a settlement between DEP and Objectors that did not affect Sunoco's permits or, indeed, even involve their participation. Sunoco submits that "the Board would have great difficulty discerning the motivations of any one party for agreeing to any of the relatively insignificant 'successes' claimed by the Objectors in this case."[109] Speculating that doing so would require "exhaustive hearings" examining Sunoco's subjective intent in submitting information to support its application and the parties' motivations behind

---

[108] *See Clean Air Council* Bd. Op. at 22 (Renwand, C.J., concurring and dissenting) ("When permits are challenged, the permittee and the Department may at times work closely in defending the permit before the [Board].").

[109] Sunoco's *Clean Air Council* Br. at 49.

agreeing to each term in the stipulated orders, Sunoco posits that the relevant analysis under the *Kwalwasser* test would be unworkable, if not impossible—a concern it also echoes with regard to the catalyst test. These arguments are not outlandish, as far as they carry. But it bears emphasis that one can just as well speculate that the bad-faith inquiry presents no less of a challenge; it, too, requires consideration of subjective, fact-intensive considerations. That the inquiry may be difficult is immaterial if it is an inquiry that the General Assembly authorized or prescribed.

Moreover, such an inquiry is precisely where the Board's discretion becomes most important. The Board, comprising subject matter experts who are familiar with the case and guided by submissions made by the various parties' counsel, is best positioned to determine what considerations should inform the allocation of responsibility for fees, if any. And to suggest that the Board cannot or should not undertake such a task when hundreds of thousands of dollars, even millions, are on the line seems both to mistake the seriousness of such a claim and to diminish the Board's capacity for rigor and probity.

It necessarily follows from these observations that, as in *Solebury*, we should refrain from endorsing or calling into question the *Kwalwasser* or catalyst approaches to assessing fees. We have seen no flaw in either, aside from the finer point we rectified in *Solebury*, but we have no occasion or cause to direct that the Board henceforth apply it.

### C.     Conclusions

We granted review on three facially distinct issues raised by Objectors and DEP in these cases. But they really distill to two, the first of which involves our standard of review. We hold that the Commonwealth Court erred in determining that the Board's adoption of a highly restrictive *per se* rule—which is incompatible with the legislature's intent as

reflected in the CSL's broadly worded fee-shifting provision—may be reviewed only for an abuse of the Board's discretion.  Accordingly, we have reviewed these standards against the CSL *de novo*.

The second question concerns whether the Board erred as a matter of law (1) in implementing a *per se* bad-faith standard to determine whether to assess fees arising from CSL appeals against private parties, and, as a corollary, (2) in leaving DEP the lone party not protected by so stringent a standard.  The answer is yes.  The Board erred as a matter of law, because, like the strict prevailing-party requirement in *Solebury*, a categorically exclusionary bad-faith requirement is incompatible with the CSL's remedial intent.  This is particularly so in regard to the role it assigns to initially uncompensated citizens and entities in ensuring compliance with, and enforcement of, the CSL.  We also refrain from taking a position on whether any particular standard that we have not had occasion to consider in this case (for want of its application below) is prescribed or preferable to another.  That is a matter for the Board's discretion.

Our answer to the second question effectively answers the third question, which concerns the application of disparate standards between DEP and applicants.  In rejecting a *per se* bad-faith approach for applicants, we place them at the same starting line as DEP for purposes of fee liability.  Each case, complicated and rife with the potential for mistake, error, or even mis- or malfeasance, stands alone.  In a given case, fault for an error (if any) may lie to a greater extent with either DEP or the applicant.  *Here* is where the broad discretion conferred upon the Board, discretion that, once exercised, may only be evaluated for its abuse, is vital.

We reject only an actual or constructive *per se* rule that renders quixotic an objector's effort to recover from an applicant the expense of serving as a private enforcer of environmental laws. The categorical rule adopted by the Board and embraced by the Commonwealth Court leaves DEP the lone source of recompense where recompense is merited, even though DEP is compelled by a necessity borne of *legislative design* and practical necessity to rely upon the applicant's inaccurate representations—whether made by intention or by mistake, omission, or sheer laziness. Any task can be performed in good faith but poorly. But where fault lies at the feet of the applicant, nothing in the law recommends (much less commands) forcing DEP to indemnify the blameworthy party.

Applicants do not seek permits absent a profit incentive. Market enterprises can and do pass on their permitting expenses to their consumers no differently than they pass on their executive compensation obligations and their other costs of doing business. But citizen objectors as *de facto* regulatory enforcers typically stand only to gain in the broad, public-serving sense. The closest thing to a private benefit to be derived from appeals is exemplified in *Gerhart*, where the objector's gain was mitigation of damage to their real property. But even that financial motivation is fundamentally remedial or defensive, not profitable in conventional economic terms. While it may be laudable to ensure that Pennsylvania's environment is preserved consistently with the law, doing so is not a terribly remunerative venture.

This is by no means to say that applicants should always be as responsible for fees as DEP is—or vice-versa. In making that assessment, the Board is free to apply *Kwalwasser* (as qualified by *Solebury*), the catalyst test (as arguably endorsed by *Solebury*), or another standard that does not exceed the modest limitations that we have

imposed upon the Board's discretion in those cases and in this one. What is most important is that, however the Board approaches fee applications, it must focus upon why the CSL's fee-shifting provision exists.

The General Assembly, by and through its broad grant of discretion to the Board, has strongly implied that it expects the Board to award fees against *any* party without fear or favor. The express legislative goal here is clean water, and the bulwark against its degradation is the permitting process as supplemented by the availability of citizen appeals. That process is impoverished if citizen action is rendered impracticable by a Board disinclined to employ liberally the mechanism the General Assembly gave it against any party that shares responsibility for whatever flaws are rectified by a given appeal.[110] Shrinking the likelihood of fee recovery to the vanishing point can only deter citizens entrusted to police both DEP and those who solicit and then reap the benefits of DEP's approval.[111]

---

[110] We intend no hard and fast rule regarding the standard to be applied to transferring fees from objectors to applicants—or, for that matter, to DEP. The Board in *Lucchino* already suggested that the structure of the CSL militates in favor of holding objectors responsible only in the event of their bad faith, and on appeal we did not choose to quarrel. Certainly, there is a strong argument that the CSL's intent would be disserved if objectors did not enjoy protection against being assessed fees when they bring colorable, good-faith permit appeals that fail nonetheless.

[111] The Dissent evidently would allow the Board to do precisely that, embracing so expansive a view of the Board's discretion that it affords no limiting principle—up to and including eliminating fee recovery entirely. True, this prospect presently is "hypothetical." Diss. Op. at 4. But this Court must fashion rules with an eye to their downstream effects, and the Dissent offers no limiting principle that stands in the way of that eventuality. Moreover, that scenario's plausibility is visible in the undisputed rarity with which objectors seek to recover from applicants, and the Board's own suggestion that applicants seeking fees from objectors is the more common scenario. *See id*. at 4 n.1; *Clean Air Council* Bd. Op. & Order at 7; *cf. id*. at 20 n.1 (Renwand, C.J., concurring and dissenting) (asserting that no objector has yet recovered from a permittee). It is no answer to suggest that DEP is always available to compensate—with essentially public funds—objectors who identify (continued…)

## IV. The dispositions

In *Clean Air Council*, we could conclude that the Board correctly denied relief because Objectors settled with DEP and did not substantially prevail on their appeals of Sunoco's permits. But precisely out of deference to the Board's discretion, we decline to do so. Sunoco claims that the modest adjustments to permits and/or practices embodied in the stipulated orders entered into long before Objectors' claims were finally litigated

violations in the public interest. Had the legislature intended for objectors to recover expenses only from DEP it could have written that into the CSL. The Dissent waves away this concern by asserting that it can be prevented if necessary by finding an "abuse of discretion." But this reveals that the Dissent's criticism departs from our view only in degree, not kind. In our view, it is an abuse of discretion to preclude any accountability for the applicants who benefit from making the least effort the CSL allows simply because the objector fails to establish bad faith. And the CSL resists the conclusion that the General Assembly intended for DEP alone to bear the cost of holding less than punctilious applicants responsible for their noncompliance.

Similarly, the Dissent's suggestion that we have departed from *Solebury* and *Lucchino* is precisely backward. *See* Diss. Op. at 5 (opining that our decision "represents a significant deviation from this Court's jurisprudence"). While the Dissent correctly describes those cases' dispositions, it disregards this Court's cautionary observations that we should not allow the Board to restrict the availability of fees to the private objectors who bear the expense of enforcement in lieu of DEP. We should not cast aside that we proscribed any approach that would render fees effectively unrecoverable by objectors— and, in *Lucchino*'s invocation of *Tunison*, that we emphasized our obligation to construe liberally the uncommon occasions when the General Assembly provides for fee-shifting in derogation of the prevailing "American Rule." *See generally supra* at 7-13. Setting aside the incompatibility of the Dissent with the broader import of those opinions, the Dissent relies upon a statutory interpretation that removes Section 307 fee-shifting from the CSL's context, including its statutory Declaration of Policy. *See* 35 P.S. § 691.4 (calling for "a comprehensive program of watershed management and control" in service of "the prevention and elimination of water pollution"). To say that the Board may tailor an approach that proves most workable and equitable in the breach is not to say that it may depart entirely from the legislature's clear intent to offset the CSL's reliance upon citizen enforcement with a realistic prospect of reimbursement when such efforts prove warranted. Yes, the Board may craft standards and render decisions based on case-specific equities. But it must do so in a way that serves the General Assembly's broader intent. It requires no departure from the text of the CSL to discern that intent and its incompatibility with a strict bad-faith approach to recovery from applicants. It requires a narrow, selective view of that text to miss it.

could not be deemed prevailing on the merits.  But because Sunoco made adjustments to its permits as part of the negotiated agreements, and should not have enjoyed the protection of the *per se* bad-faith standard, we will not take for granted that the Board would rule the same way in the wake of our review of the bad-faith rule.  It is not our place to usurp the Board's superior position in the first instance to review the record in light of the guidance we have provided here.

Accordingly, we vacate the Commonwealth Court's ruling in *Clean Air Council*, and we remand for further Board proceedings consistent with this Opinion.[112]

In *Gerhart,* DEP is the appellant, and its argument is not that it should not have been assessed the modest fees ordered, but rather that it should not have to bear the cost of those fees alone.  Even more so than in *Clean Air Council*, we cannot conclude that the Board, bereft of the *per se* rule upon which it relied, would not have divided those fees between the parties, especially because the Board limited fees specifically to those incurred before Sunoco offered to restore the Gerharts' wetlands as requested.  Up until that point at least, Sunoco was very much a target of the Gerharts' appeal.  We will return this case as well to the Board to make this determination in the first instance.

Accordingly, we vacate the Commonwealth Court's ruling in *Gerhart* and remand for further Board proceedings consistent with this Opinion.

---

[112]  Sunoco maintains that it should not be liable for fees under any test.  The argument that follows is manifestly fact-based and does not conform to the *Kwalwasser* test or any other.  It relies upon Sunoco's minimization of the practical effects of the stipulated orders into which it entered with Clean Air Council, its intentions affecting its allegedly trivial adjustments, and other record-intensive assertions that, in the context of this case, we do not believe it prudent to decide in the first instance.  For the reasons set forth, we remand this case for further assessment of these claims without the constraining effect of a reflexive bad-faith standard.

Chief Justice Todd and Justices Donohue and Dougherty join the opinion.

Justice Mundy files a dissenting opinion.

The Late Chief Justice Baer did not participate in the decision of this matter.

Justice Brobson did not participate in the consideration or decision of this matter.